## Beach Properties, Inc. v. Town of Ferrisburg

[640 A.2d 50]

No. 92-478

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed February 28, 1994

*Patricia E. Dilley* of *Downs, Rachlin & Martin*, Burlington, for Plaintiff-Appellee.

*Donald R. Powers* of *Powers, English & Carroll, Ltd.*, Middlebury, for Defendant-Appellant.

**Johnson, J.** The Town of Ferrisburg appeals from a decision of the State Board of Appraisers that reversed the decision of the Ferrisburg Board of Civil Authority and declared that the taxpayer's property should be listed in the 1991 grand list for $3,850,000, rather than $4,806,000. We reverse.

The subject property is the Basin Harbor Club, a summer resort and convention center on 584.3 acres of land along the easterly shore of Lake Champlain. The property has 136 guest cottages and rooms, restaurants, a developed waterfront, airport runway, tennis courts, swimming pool, 18-hole golf course,

conference and banquet facilities, as well as other recreational facilities. It has approximately 4,000 feet of shoreline on Lake Champlain and about 10,000 feet of frontage on public highways in the area.

The taxpayer, Beach Properties, Inc., is wholly owned by members of the Beach family, who have owned and operated the property as the Basin Harbor Club since 1886. In 1990, Robert H. Beach, Jr. and Ann P. Beach Morris, who are managers of the property and employees and stockholders of the corporation, became its sole owners by acquiring all of the stock of the corporation then owned by other family members. The purchase price for the acquired stock was derived from a theoretical sale price for the entire property.

To determine the property's value, the Town relied on a combination of the cost approach and market sales comparison approach. The cost approach adjusted for time, location, physical characteristics and depreciation, to determine the contributory value of buildings and improvements. The market sales comparison approach developed a schedule of land values and Lake Champlain shore frontage values derived from actual sales data. The Town also contended that its valuation of $4,806,000 was confirmed by a consideration of potential and prospective uses of the property. Specifically, the Town argued that the property's existing waterfront cottages could be sold to individual owners through various forms of ownership without affecting the core resort's viability as a commercial enterprise.

In response to the Town's assessment, the taxpayer had the property appraised. The taxpayer's appraisal supported a property value of $3,850,000, which reflected a value of the Basin Harbor Club of $4,600,000 minus $750,000 for furnishings, fixtures and equipment. The appraiser arrived at this value by using an income capitalization analysis, derived from the net income for a single year, 1990, the sale price of the intra-family stock transfer, and a market sales comparison analysis, using two out-of-state resort sales as comparables.

The Board of Appraisers found for the taxpayer, concluding that the intra-family sale price of the stock and the income capitalization method provided the most compelling indication of the 1991 fair market value. The Town appealed, claiming the Board of Appraisers erred by making findings that were so devoid of evidentiary support as to be clearly erroneous.

## I.

In the present case, all issues were hotly contested. Serious questions were raised by the Town about the validity of the methodology used in the taxpayer's appraisal report and the lack of any indicia of reliability about the income figures that were at the heart of the taxpayer's analysis. The taxpayer, in turn, questioned the Town's cost approach on the ground that the Town did not adequately assess depreciation of the buildings. The taxpayer also took issue with the speculative nature of the Town's proposed scheme for division of the property.

■ Before addressing the Town's substantive attack on the evidence, we briefly review the role of the Board of Appraisers in contested hearings. Appeals to the Board of Appraisers are hearings de novo, 32 V.S.A. § 4467, and the Board is required to make findings of fact supporting its ultimate determination. *Manganelli v. Town of Proctor*, 144 Vt. 451, 453, 479 A.2d 155, 156 (1984). Where conflicting evidence has been presented, the Board must state clearly what evidence it credits and why, so that the parties and this Court will know how the decision was reached. *Corrette v. Town of St. Johnsbury*, 140 Vt. 315, 316, 437 A.2d 1112, 1113 (1981). Although a tribunal may accept the testimony of specific witnesses or specific requests for findings and adopt the content of that testimony or those requests as the findings of the court, *Bonanno v. Bonanno*, 148 Vt. 248, 250, 531 A.2d 602, 603 (1987), "[a] recitation of the testimony is not a finding of fact, and such a recitation will not support a judgment." *Corrette*, 140 Vt. at 316, 437 A.2d at 1113–14. Unless the Board's determination of value is supported by adequate findings, it will not be affirmed. *Sondergeld v. Town of Hubbardton*, 150 Vt. 565, 570, 556 A.2d 64, 67 (1988).

In finding for the taxpayer, the Board made virtually no findings of its own, but rather described and summarized the dispute between the parties. The Board's mere reference to the documentary submissions of each of the parties as its findings does not support its judgment. *New England Power Co. v. Town of Barnet*, 134 Vt. 498, 502–03, 367 A.2d 1363, 1366 (1976). While the Board's decision is reversible for lack of findings alone, this is not a case in which a remand for adequate findings would cure the errors below because we also hold that the

Board's conclusions are insupportable on the evidence presented.

## II.

### A.

■ The Board's determination of fair market value relied on taxpayer's income capitalization method. The capitalization, or income approach, "restates market value by converting the future benefits of property ownership into an expression of present worth." International Ass'n of Assessing Officers, *Property Assessment Valuation* 231 (1977). On a purely theoretical basis, income capitalization is probably the most accurate way to establish value, at least as to commercial properties, because it values property on the basis of what income it will yield to the purchaser—and income is the very reason for the purchaser to acquire the property. *Id.* at 253. We have accepted the use of this approach as a means of determining fair market value. *New England Power Co.*, 134 Vt. at 505, 367 A.2d at 1368. But the methodology used to calculate the capitalization rate in this case was so flawed that it rendered the taxpayer's evidence on this point meaningless.

The income approach is based on the proposition that a rational investor would pay the fair market value for a piece of property, which is the price (P) that, when multiplied by the rate of return available from alternative investments of comparable risk (the capitalization rate or R), is equal to the property's expected net income (I). In other words, if the known factors are capitalization rate and net income, the price of the property may be calculated by dividing the net income by the capitalization rate: $P = I/R$.[1] *International Ass'n, supra*, at 231–34.

In application, however, income capitalization has serious, inherent difficulties. As noted above, there are two figures to the

---

[1] For example, if the appropriate capitalization rate for an investment is eight percent and the net income is $100,000, the fair market value of the property is $100,000 divided by .08 or $1,250,000. For a general discussion of the income approach to property valuation, including calculation of the capitalization rate and analysis of expenses, see International Ass'n of Assessing Officers, *Property Assessment Valuation*, 203–75 (1977). While our description here is an oversimplification of a complicated process, it is sufficient to illustrate taxpayer's analysis.

price calculation. The first is the appropriate capitalization rate or the expected rate of return on investment. It is derived from an analysis of factors external to the investment for which fair market value must be determined. Thus, the validity of the capitalization rate depends on an adequate analysis of the market. Since "[a] rate that indicates the return required to attract investment capital is the connection between the future income and a value indication, . . . selection of [the] rate is of paramount importance in the capitalization process." *Id.* at 231. Relatively small variations in the rate will significantly change the fair market value.[2] The key is comparability, and economists and other experts will frequently differ, at times widely, as to what comparable investments will yield, even where there is agreement on what constitutes comparability.

An even greater difficulty may attend the calculation of the second component of the calculation, the expected net income. Unlike the capitalization rate, it is derived from the internal numbers of the investment under appraisal. In a property such as the Basin Harbor Club, income depends on a wide variety of factors, ranging from the competence of management to the economic climate experienced by the establishment's customer base to the weather. Because relatively small adjustments to net income will significantly alter the resulting fair market value, it is important that expenses leading to net income be subject to scrutiny by the trier of fact.[3]

In this case, the taxpayer's evidence as to both the capitalization rate and the property's expected net income was insufficient to provide the basis for a valid income capitalization calculation. First, there was no external validity, by comparison with the rate of return of similar businesses, to the capitalization rate the taxpayer suggests. The taxpayer's capitalization rate was determined wholly with reference to "internal" numbers. It was derived by dividing the net profits of the Basin

---

[2] From footnote 1, we know that if the capitalization rate is 8% and the property's net income is $100,000, then the price is $1,250,000. If the capitalization rate is 1% higher, 9%, the price is only $1,111,111.

[3] For example, if the capitalization rate is 8% and the property's net income is $100,000, the price is $1,250,000. If the expected net income is estimated to be $10,000 higher, $110,000, the price increases to $1,375,000.

Harbor Club from a single year, 1990, by the theoretical sale price upon which the intra-family stock transfer was based, postulated for these purposes as the fair market value.[4] This is a meaningless calculation because it derived a capitalization rate from a postulated fair market value for the property under appraisal, rather than deriving fair market value from a postulated capitalization rate based on investments with similar risk.

■ Second, the net income component of the equation was not supported by sufficient evidence. The taxpayer submitted the net income figure from a single year, 1990, of $457,432. Because of the number of variables that affect net income, it is generally expected that a "stabilized annual net income" reflecting more than one year's set of figures will be used as the basis for income capitalization. *District of Columbia v. Washington Sheraton Corp.*, 499 A.2d 109, 113–14 (D.C. 1985) (quoting *Rock Creek Plaza-Woodner Ltd. v. District of Columbia*, 466 A.2d 857, 858 (D.C. 1983)). Moreover, the fair market value should be based on the property's potential for earning income as well. *Springfield Marine Bank v. Property Tax Appeal Bd.*, 256 N.E.2d 334, 336 (Ill. 1970) ("[I]t is the capacity for earning income, rather than the income actually derived, which reflects 'fair cash value' for taxation purposes."). Net income was increasing for this business. As the taxpayer's appraisal showed, net income increased in 1991 to $510,878, and the appraisal report predicted "a modest, but steady increase."

The use of a single year's income is even more perilous here because the income figure is based on taxpayer's internal, unaudited financial statements. This figure might have been acceptable if it had been sufficiently itemized to permit the Board

---

[4] When taxpayer's expert (Keller) was questioned by a Board member (Cole) about where the capitalization rate came from, the following exchange occurred:

Cole: What you're doing . . . is you're using the price that Bob and Pennie paid—
Keller: There's nothing else out there.
Cole: But, that's where your cap rate came from is what they paid for it.
Keller: That's right. . . .
Cole: So, what you're really doing is backing into it a cap rate reflecting that sale.
Keller: Right.

to question the items that affected the bottom line. Itemization, however, was limited to broad categories within the headings of departmental expenses of $2,239,001 and undistributed operating expenses of $1,521,178. Significantly, there is no breakdown showing compensation to owners that would have allowed the Board to determine if the amount of salary or other distributions to family-member employees unduly affected net profits. As the Town points out, there is every incentive in a family-owned business to distribute profits in the form of compensation and reduce corporate net income. The Board had insufficient evidence before it to determine the reliability of the 1990 net income figure.

### B.

Central to the Board's acceptance of the taxpayer's income capitalization analysis is whether the 1990 transfer of stock from various family members to the present owners reliably reflected the property's fair market value. The capitalization rate used to derive the taxpayer's appraisal value is based solely on that sale. The Board recognized that intra-family transfers are not ordinarily a reliable reflection of fair market value, but found that the sale was at arm's length. Even if we were to accept the taxpayer's income capitalization methodology, the record does not support the conclusion that the sale was at arm's length.

The taxpayer argues that the sale was adversarial within the family and that the Town is relying on innuendo and conjecture, without proof, to raise questions that the intra-family sale was not at arm's length. The fact that the sale may have been adversarial within the family, while protecting common family interests, simply does not prove the sale was at arm's length. The question is not whether the Town proved the sale was not at arm's length, but whether the taxpayer proved it was. See *New England Power Co.*, 134 Vt. at 508, 367 A.2d at 1369 (the burden of persuasion "as to the contested issues in a § 4467 hearing remains at all times with the taxpayer").

"[A]n arm's-length sale is characterized by these elements: it is voluntary, *i.e.*, without compulsion or duress; it generally takes place in an open market; and the parties act in their

own self-interest." *Walters v. Knox County Bd. of Revision*, 546 N.E.2d 932, 935 (Ohio 1989). While there is no doubt the sale was voluntary, it did not occur in an open market, and the price was negotiated by the parties without an appraisal. The remaining evidence is inadequate to show that self-interest prevailed over common family interests and predilections.

The only evidence offered that the family sale was at arm's length came from Ann P. Beach Morris. Her testimony, however, belies the notion of self-interest between buyer and seller, and in fact lends weight to the opposite conclusion:

> Anybody who doesn't believe this was an armslength transaction doesn't know much about anything, because it was. Mr. Chairman, I'd like to say that through the history of the Basin Harbor property, the control of the Beach family, which has become Beach Properties, Inc., I think it's been made clear that *we're not in this for the money.* A lot of money changes hands here in the course of the year, but not very much of it sticks to our hands. I think if you look back through the history of how we've husbanded it, the land, when the Woods houses were sold off . . . those are the lots that abut our property to the south between here and Button Bay on the lakeshore, our grandmother . . . *there wasn't any zoning then, so there could have been eighth-acre lots. You could have had fifty houses down there instead of 20. He wasn't in it really for the money. He was in it to create an aesthetic place where people wanted to be.* We had sold some other lots to people over the course of time and we've bought all those back. *The property is here as it is today because my family inherently resists change . . . .*

(Emphasis added.) The testimony continues in the same vein, reiterating the difficulty in getting all family members to agree on changes that might be made to the property and reaffirming that the Beach family wished to maintain the property in its present use. This goal has been accomplished by retaining control and ownership within the family. Indeed, there was no dispute that the Beach family has rejected previous offers and inquiries from outsiders, including an offer of $4,500,000 in 1986, and another in the same year for $3,300,000 and management contracts and substantial interests in land and resort privileges to the Beach family.

In addition, the appraisal report submitted by the taxpayer reveals that the intra-family sale secured the rights of various members of the Beach family to live on the property and have access to its facilities and dockage. Ann P. Beach Morris has a perpetual land lease for one dollar to accommodate her personal residence. David Beach has a life estate and a residence developed in 1990. Four properties owned by Beach family members or their heirs have water and sewage disposal rights and the right to adapt to alternate water and sewage systems as provided by the property. Thus, even if the intra-family stock sale was an arm's length sale, it was clear error to use that transaction price as a proxy for market value without considering the value of the retained rights and perquisites of family members. See *Irving Saunders Trust v. Board of Assessors of Boston*, 533 N.E.2d 234, 237–38 & n.2 (Mass. App. Ct. 1989) (below-market rental to relative of one of owners indicated that such space was "patently underutilized" and was not put to highest and best use).

In light of our decision, it is unnecessary to reach other issues raised by the Town.

*Reversed and remanded.*