## Arnold D. Waller v. American International Distribution Corporation, Paul Sprayregen, Peter A. Miller, and Marilyn McConnell

[706 A.2d 460]

No. 96-446

Present: Amestoy, C.J., Dooley, Morse and Johnson, JJ., and Allen, C.J. (Ret.), Specially Assigned

Opinion Filed November 26, 1997

Motion for Reargument Denied January 20, 1998

*David W.M. Conard* of *Portnow, Little & Cicchetti, P.C.*, Burlington, for Plaintiff-Appellee.

*Christina A. Jensen* of *Lisman & Lisman, P.C.*, Burlington, for Defendant-Appellant.

**Amestoy, C.J.** Defendants appeal from an order of the Chittenden Superior Court directing them to purchase plaintiff's minority interest of shares in defendant corporation at the value set by the court. Defendants argue that the court erred in its valuation of plaintiff's stock by (1) basing valuation on the corporation's 1992 financial performance, (2) failing to consider plaintiff's offer to sell his stock, (3) failing to consider his minority shareholder status, (4) using the "discounted future earnings" method of valuation, and (5) making "normalizing" corrections to the corporation's financial performance. We affirm.

## I. Facts

Plaintiff Arnold Waller founded defendant company American International Distribution Corporation (AIDC) in 1986. Incorporated in Vermont, AIDC performs warehousing and order fulfillment for book publishers and direct mail services. Defendant Peter Miller joined the company in 1987 as co-owner and chief executive officer.

In July 1987, defendant Paul Sprayregen began providing AIDC with substantial funds to help offset company losses, in return for which Waller and Miller agreed that. Sprayregen would receive a fifty-one percent interest in the company, Miller thirty percent, and Waller nineteen percent. In 1988, Waller and Miller each conveyed a five percent interest to a new employee, Marilyn McConnell, leaving Miller with a twenty-five percent interest and Waller with fourteen percent. Waller, Miller, and McConnell received salaries, while Sprayregen did not.

In June 1990, Sprayregen negotiated and personally guaranteed a $500,000 bank loan for AIDC. At about that time, Waller requested that AIDC assume liability on the renewal of an earlier $10,000 bank loan, which had been personally guaranteed by Waller and his wife. Miller and Sprayregen were angered by the request because AIDC was paying interest and principal on Waller's note and Sprayregen himself was at risk for over $600,000. Miller told Waller that AIDC would assume Waller's debt only if he gave up his stock in the company, an offer which Waller declined. Thereafter, Miller threatened Waller with loss of his job, but retracted his threats, and Waller was not fired.

On April 4, 1990, Waller delivered a letter to the company stating that he would sell his stock and resign his position only if $14,500 of loans he had taken on behalf of the company were repaid by the company and if he received a severance package. The next day Waller

attended a shareholders' meeting at which a majority of the shareholders voted to remove him as president and director of AIDC, but not to fire him as an employee. Waller then quit his job, telling Miller that he did not want to stay where he was not wanted. Defendants did not involve him in the affairs of the company thereafter.

As of March 1990, Sprayregen had advanced AIDC a total of $618,490 through promissory notes at ten percent interest. Although business expanded rapidly between 1988 and 1991, AIDC made no payments of interest or principal on Sprayregen's advances until 1992, the first year in which the company showed a net profit, when it paid him $83,159 in interest. In 1992, AIDC also paid Sprayregen's wholly-owned company, Investors Corporation of Vermont (ICV), a $50,000 management fee, which the court found was based on AIDC's ability to pay, rather than on the services actually performed by ICV.

In September 1991, Waller filed a complaint alleging that defendants acted to "squeeze out" Waller by withholding information about the affairs of the corporation and firing him. Waller claimed damages, however, relating only to frustration of his "reasonable expectations to receive a return from his investment and labor through the payment of salary and benefits."

The court found that Waller's job loss at AIDC resulted from Waller's choice to leave and not from majority oppression. The court did find, however, that the majority had oppressed Waller by depriving him of his rights and interests as a minority shareholder of AIDC, and concluded that he was entitled to a monetary remedy.

The court considered several methods of valuing Waller's fourteen percent share in AIDC and, based on the testimony of Waller's expert, concluded that the "discounted earnings" method was appropriate, which on these facts was indistinguishable from the method commonly called the "income capitalization" approach. See *Beach Properties, Inc. v. Town of Ferrisburg*, 161 Vt. 368, 372, 640 A.2d 50, 52 (1994) (explaining capitalization, or income approach to establishing fair market value of property). Although the complaint had been filed in 1991, the court concluded, over defendants' objection,[1] that company profits from 1992 provided an appropriate basis for calculating stock value under the income capitalization formula. The court awarded Waller $92,500, and the present appeal followed.

---

[1] Plaintiff's argument that defendants did not preserve this argument is without merit because defendants' counsel stated during the testimony of plaintiff's valuation expert that his objection to the use of 1992 was not waived, and the court noted a continuing objection.

## II. Waller's Claims of Oppressive Conduct

### A. "Oppressive Conduct" Claim and Use of 1992 as Base Year

■ Where a court finds that "the acts of the directors or those in control of the corporation are . . . oppressive," the court may liquidate the assets of the business. 11 V.S.A. § 2067.[2] Defendants do not challenge the trial court's determination that their actions oppressed Waller. AIDC's issues on appeal focus on the remedy fashioned by the court.

Remedies provided under 11 V.S.A. § 2067 do not specifically include a buyout of a minority shareholder who alleges oppressive conduct by the majority interest in a corporation. Some courts in other states, however, have construed similar statutes and found the buyout remedy appropriate where there has been oppressive conduct but dissolution is not necessary to provide the plaintiff with a suitable remedy, and dissolution would needlessly harm a functioning business. See, e.g., *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 274-75 (Alaska 1980); *Sauer v. Moffitt*, 363 N.W.2d 269, 274-75 (Iowa Ct. App. 1984). We need not reach this question because defendants here concede that the court did not err in mandating a buyout under 11 V.S.A. § 2067. Defendants argue rather that it was error for the court to base its valuation on AIDC's 1992 financial performance because the prevailing law in other jurisdictions is that valuation should be determined as of the date the complaint is filed, in this case 1991.

■ Because 11 V.S.A. § 2067 is silent regarding the proper date of valuation, the standard to be applied in weighing the validity of the court's order is whether it abused its discretion in exercising its general equitable powers. See *Kanaan v. Kanaan*, 163 Vt. 402, 407, 659 A.2d 128, 132 (1995) (valuation of closely held business within discretion of trial court); see also *Hendley v. Lee*, 676 F. Supp. 1317, 1327 (D.S.C. 1987) (proper date of valuation for forced ˙buyout purposes was date of trial on merits); *Taxy v. Worden*, 536 N.E.2d 901, 904 (Ill. App. Ct. 1989) (fair value of dissenting shareholder's stock is determined for buyout purposes by court's judgment after consideration of relevant factors).

---

[2] At the time of trial, the provisions of 11 V.S.A. § 2067 were in effect. That section was repealed as of January 1, 1994, when the Vermont Business Corporation Act (VBCA) went into effect. See 1993, No. 85, §§ 2, 3(a), eff. Jan. 1, 1994. The VBCA is codified at 11A V.S.A. §§ 1.01 - 20.16.

We do not agree that the court lacked the authority to consider 1992 as the focal year for its analysis. Defendant cites 11A V.S.A. § 20.15(b), which provides that "the court shall . . . determine the fair value of such shares as of the close of the business on the day on which the petition for dissolution was filed." This section of the Vermont Business Corporation Act became effective on January 1, 1994, after the complaint was filed in the present action.

■ Moreover, the purpose of § 20.15 makes its application inappropriate for the present case. The purpose of § 20.15 is to allow shareholders of a close corporation who desire continuation of the business to purchase the shares of the petitioner for dissolution at "fair value." 11A V.S.A. § 20.15(b). The statute encourages electing shareholders to calculate whether it is in their interests to buy out the petitioner or risk entry of a dissolution order. Once they make an election, several results ensue, each requiring a determinable focal date, including the posting of a bond, the commencement of interest payable to the minority on the value of the shares to be purchased, and the loss of the minority rights as shareholders. *Id.*

■ The trial court's decision to base share value on 1992 financial performance is reasonable under the circumstances and is supported by the record. The trial court sought to value the shares as of the approximate date of trial and decision, rather than the date Waller filed his complaint. Noting that complete financial data were not available for 1993 or 1994, the trial court chose 1992 because it was the year closest in time to the trial for which reliable data on the company's economic performance were available. The court's use of 1992 was thus not an abuse of discretion.

Moreover, in its June 1, 1995 order, the trial court expressly invited the parties to submit motions under V.R.C.P. 59 to provide the court with additional evidence of the company's financial performance in preceding years. That opportunity remained open for over a year until this Court's August 14, 1996 entry order. Defendants' failure to file a timely Rule 59 motion evidenced assent to the use of 1992 as the base year. We will not disturb the trial court's resolution of this issue.

### B. Waller's 1990 Offer as Basis of Valuation

■ Defendants next argue that the court erred in its valuation of Waller's shares by failing to consider his 1990 offer to sell his stock for payment in full of the $14,500 loans he had taken on behalf of the corporation. Defendants do not maintain that the 1990 offer was

controlling as a matter of law. Their argument is simply that the court ignored their evidence in favor of Waller's evidence. It is well settled that the weight to be given to particular evidence is a matter within the sound discretion of the trial court. *In re Vermont National Bank*, 157 Vt. 306, 310, 597 A.2d 317, 319 (1991).

## C. Minority Status of Waller's Holdings

■ Defendants also contend that the court erred in failing to recognize the minority status of Waller's holdings because "it is common knowledge that, as a practical matter, the stock acquired by one who purchases a 49% interest in a 'close' family corporation . . . is worth considerably less than 49% of the book value of such stock." *Baker v. Commercial Body Builders, Inc.*, 507 P.2d 387, 398 (Or. 1973). We find defendants' argument unpersuasive because the "minority discount" is inappropriate where the court has found oppression of the minority. See *Columbia Management Co. v. Wyss*, 765 P.2d 207, 214 (Or. Ct. App. 1988).

## D. Use of "Discounted Earnings" Method of Valuation

■ Defendants also challenge the court's use of the "discounted future earnings" method in valuing Waller's shares. Again, we disagree. As explained by Waller's expert, this method of valuation is indistinguishable from determination of market value by the income capitalization method, which we have described as "probably the most accurate way to establish value, at least as to commercial properties, because it values property on the basis of what income it will yield to the purchaser — and income is the very reason for the purchaser to acquire the property." *Beach Properties, Inc.*, 161 Vt. at 372, 640 A.2d at 52. The weight to be given to a particular method of valuation of securities is within the sound discretion of the court. *Independence Tube Corp. v. Levine*, 535 N.E.2d 927, 930 (Ill. App. Ct. 1989); *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1001 (Me. 1989); see also *Goodrich v. Goodrich*, 158 Vt. 587, 590, 613 A.2d 203, 205 (1992) (in valuation of business for divorce purposes, no single methodology is mandated, and so long as valuation is supported by credible evidence, it will suffice). The income capitalization approach may be used to value a minority interest in an action such as the one at bar. See *In re Seagroatt Floral Co.*, 583 N.E.2d 287, 290-91 (N.Y. 1991) (approving use of "capitalization of earnings" valuation method for company stock).

### E. "Normalization" of 1992 AIDC Figures

Defendants argue that even if the court's choice of valuation method was proper in theory, and the base year of 1992 was appropriate, it nevertheless erred in making two "normalizing" corrections to the company's putative income for 1992. In the first such correction, the court added back to the company's 1992 income statement a $50,000 fee paid to ICV, Sprayregen's wholly-owned company. In the second correction, the court added back to stated income the $83,159 interest payment on Sprayregen's aggregate financial contributions to the company through the end of 1992.

■ "Normalization" of an income statement is often a necessary step in the income capitalization process. By adding to the income statement certain financial transactions not initially reported therein, a more accurate profit picture results, which in turn yields a more appropriate multiplicand for the income-capitalization formula. See *Hendley v. Lee*, 676 F. Supp. at 1327 (adding salary of $93,813 to statement of corporate profits, thereby raising calculated value of company).

■ The trial court concluded that the fee paid to ICV should be recharacterized as a return on Sprayregen's investment in the company — and thus considered company income — rather than an expense for services rendered. Sprayregen was not employed by AIDC. Though he was an active shareholder with the most to lose if AIDC failed, that very factor strongly suggests that the time he spent on AIDC corporate affairs was motivated by his personal investment goals and those of ICV. The trial court was in the best position to determine whether the fee was a legitimate business expense for time Sprayregen spent on AIDC affairs or, rather, was more properly characterized as a disbursement of profit to the company's largest shareholder. We find no abuse of discretion in the trial court's conclusion that payment of the fee arose from Sprayregen's dominant position in the corporation and that the 1992 financial reports should be adjusted to reflect that amount as income.

■ The trial court similarly recharacterized the $83,159 payment to Sprayregen as a return on equity, rather than an interest payment on Sprayregen's loans. Observing that commercial lenders would not have lent money to AIDC, the court described Sprayregen's infusions of capital as bearing "the hallmark of equity, that is, capital put at risk, rather than debt." The trial court noted

that payment to Sprayregen was entirely within the control of the majority interest and could be manipulated to show inaccurately low income for the corporation. Recharacterization of the payment to Sprayregen is supported by the record below, and the court's decision to "normalize" AIDC's 1992 earnings by including an $83,159 payment to Sprayregen was well within its discretion.

*Affirmed.*