NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 100

No. 2015-356

| | |
|---|---|
| TransCanada Hydro Northeast Inc. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Civil Division |
| | |
| Town of Rockingham | March Term, 2016 |

John P. Wesley, J.

Robert E. Woolmington of Witten, Woolmington, Campbell & Bernal, P.C., Manchester Center,
  for Plaintiff-Appellant.

William H. Sorrell, Attorney General, William E. Griffin, Chief Assistant Attorney General,
  and Mary L. Bachman, Assistant Attorney General, Montpelier, for Defendant-Appellee State.

Richard H., Saudek of Diamond & Robinson, P.C., Montpelier, for Defendant-Appellee
  Town of Rockingham.


PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1. **EATON, J.** Taxpayer TransCanada Hydro Northeast, Inc. appeals from a Windham County Superior Court order setting the value of its Bellows Falls hydroelectric facility (the facility) at $130,000,000, with $108,495,400 taxable by the Town of Rockingham (Town).[1] Taxpayer argues that the superior court erred when it relied on testimony of the Town's expert witness. We correct the trial court's valuation to read $127,412,212, and affirm.

_____

[1] For the purposes of this tax appeal, the parties stipulated that 85% of the value of the facility is attributed to the portion in Vermont, with the remainder attributed to the portion in New Hampshire. Further reference to the value of the facility in this opinion is with regard to

¶ 2.    The facility, which has been in continuous operation since 1928, is one of five hydropower dams owned by taxpayer situated along the Connecticut River and is located partly in Vermont and partly in New Hampshire.  It has a nameplate capacity of 40.8 megawatts (mw) and a net peak capacity of 49.5 mw, and produces, on average, about 258,700 megawatt hours (mwh) of energy per year.  It was first licensed by the Federal Energy and Regulatory Commission (FERC) in 1938.  In 1979, the facility was relicensed for a period of forty years; that license is set to expire in 2018.  Taxpayer acquired the facility and its surrounding property from USGen New England, Inc., in 2005.[2]  Because taxpayer is an independent wholesale power producer, the electricity generated by the facility is sold at hourly market rates established by ISO New England, an independent system operator.  This is in contrast to sales under power purchase agreements (PPA), where the sale price is contracted at a flat rate.

¶ 3.    This dispute arose in 2012 when the Town listed the facility on its grand list at $108,110,000, the same value at which the facility had been listed the previous two years.  Taxpayer did not challenge the 2010 or 2011 valuations, but appealed the 2012 listing to the

the entire facility, and not solely the portion attributed to the Town, unless otherwise stated.  As noted by the trial court, a small portion of the facility's value on the Vermont side of the Connecticut River is assigned to associated land and land rights in the upstream towns of Weathersfield, Springfield, and Windsor.  The value of the land in those towns is not disputed and accounts for the mathematical disparity between 85% of the $130,000,000 and the Town's proposed value of the facility.

[2]  Under the ownership of USGen, the facility was the subject of litigation before this Court.  In USGen New England, Inc. v. Town of Rockingham, the Court discussed the difficulties in valuing a hydroelectric facility in a deregulated electrical power market.  2003 VT 102, ¶ 1, 176 Vt. 104, 838 A.2d 927 (USGen I).  As we reiterated in that opinion, "the income-production of [the] hydroelectric facility will be extremely relevant, if not determinative, to its value."  Id. ¶ 21 (citing New England Power Co. v. Town of Barnet, 134 Vt. 498, 505-506, 367 A.2d 1363, 1368 (1976)).  The parties agreed that the income capitalization method was the preferred method of valuing the facility.  In USGen New England, Inc. v. Town of Rockingham, the taxpayer disputed the analysis of the Town's expert witness on valuation of the facility.  2004 VT 90, ¶ 1, 177 Vt. 193, 862 A.2d 269 (USGen II).  In USGen II, we affirmed the superior court decision establishing the value of the facility at $102,608,000, of which $90,377,100 was attributable to the Town.

Board of Civil Authority, and then to the superior court pursuant to 32 V.S.A. § 4461(a). The State of Vermont intervened in the appeal on behalf of the Town.

¶ 4. At trial, both taxpayer and the Town presented expert testimony as to the value of the facility. The experts' opinions on value varied substantially, ranging from taxpayer's estimate of $84,000,000 to the Town's estimate of $130,000,000. Taxpayer offered testimony on value from Daniel Peaco, an engineer and consultant. Peaco employed an income-based approach to valuation of the facility using a discounted cash flow (DCF) analysis,[3] and concluded that on April 1, 2012, the fair market value of the facility was $84,000,000, of which $67,000,000 was attributable to the Town.[4] The Town offered expert testimony from George Sansoucy, a registered professional engineer in New Hampshire and a certified real estate appraiser in several states, including Vermont. Sansoucy prepared an appraisal of the facility using both the DCF analysis and a comparable sales analysis.[5] He concluded that based on the DCF method, the facility had a value of $116,417,250, and that based on the comparable sales approach, it had a value of $142,287,750. After reconciling the income and sales values, Sansoucy concluded that the fair market value of the facility on April 1, 2012 was $130,000,000, of which $108,495,400 was attributable to the Town. The difference between the two appraisals amounts to $41,495,400. The experts' opinions were complex, and taxpayer has made several challenges to the court's acceptance of the Town's expert's opinion. Most of the issues taxpayer raises on appeal pertain to specific inputs or assumptions made by Sansoucy in each of the two

---

[3] As discussed in greater detail below, the DCF method is an income-based approach to valuation that considers future revenues, minus the cost and expenses, discounted to present value.

[4] This calculation again accounts for the mathematical disparity between 85% of the $84,000,000 and taxpayer's proposed value of the facility due to the small portion of the facility's value on the Vermont side of the Connecticut River that is assigned to associated land and land rights in the upstream towns.

[5] As detailed below, a comparable sales analysis relies on the sales of comparable facilities to determine fair market value.

methods of valuation he employed. Accordingly, to give context to the challenges raised on appeal, a detailed discussion of how the experts arrived at their opinions on value is necessary.

## I. Methods of Valuation

### A. Income-Based Approach

¶ 5. Both experts relied, at least in part, on a DCF analysis, an income-based approach to valuation. This approach converts the future benefits of property ownership—that is, the income the property will generate—into an expression of the property's present worth by discounting each future benefit at a rate that reflects the investment's income pattern, value change, and yield rate. In Beach Properties, Inc. v. Town of Ferrisburg, we explained this approach as follows:

> The income approach is based on the proposition that a rational investor would pay the fair market value for a piece of property, which is the price (P) that, when multiplied by the rate of return available from alternative investments of comparable risk (the capitalization rate or R), is equal to the property's expected net income (I). In other words, if the known factors are capitalization rate and net income, the price of the property may be calculated by dividing the net income by the capitalization rate: $P = I/R$.

161 Vt. 368, 372, 640 A.2d 50, 52 (1994) (footnote omitted).

¶ 6. Converting periodic income and reversion into present value is called discounting, and the rate of return is called the discount rate. In a DCF analysis, a yield rate is applied to a set of projected income streams and a reversion to determine whether the investment property will produce a required yield given a known price of acquisition. The critical elements in the DCF approach are net income or revenue (I), which can be discounted back to present value using the predetermined discount rate (R), to arrive at price (P). Net income is dependent on projected revenues, including capacity revenue and energy prices, less expenses. It is then discounted by a discount rate, or rate of return, which represents the cost of borrowing money to pay for the purchase of an asset. A lower projected cost of capital generally results in a higher estimated fair market value. Although both experts' DCF analyses employed the same general methods,

4

differences in the inputs and treatment of certain variables resulted in vastly different opinions on value.

¶ 7.    Each expert's revenue projection was derived from annual generation figures multiplied by the predicted price of electricity for the particular future year. Both experts made certain assumptions about the facility's generating capacity, using historic data regarding stream flows and facility operation. The primary difference in the experts' calculations stems from differences in the number of years used to determine the average generation in megawatt hours. Sansoucy relied on a ten-year average of generation, for the years 2000 through 2011, a time period he determined would capture the evolving trends of increased rainfall on the Connecticut River and increased efficiency and capacity at the facility during that time. He predicted that future generation would be 258,700 mwh per year. Peaco relied on a twenty-year average of generation, for the years 1991 through 2011, a time period he determined would account for fluctuations in short term hydrologic phenomena. He predicted that future generation would be 242,000 mwh per year, 16,700 mwh less than Sansoucy's estimated generation.

¶ 8.    The experts also differed in their projected expenses, which accounted for a difference in fair market value of approximately $8,400,000. Both parties considered two main categories of expenses in their DCF analyses: (1) maintenance costs and capital expenses; and (2) protection, mitigation, and enhancement expenses (PM&E).[6]

¶ 9.    The primary differences in the experts' calculations were with regard to their treatment of capital expenses and the treatment of the projected costs of relicensing. Among maintenance costs and capital expenses, Sansoucy considered the costs of operation and maintenance (O&M), administrative and general costs, and capital expenditures. He allocated about $55 per kilowatt (kw) of capacity, or $2,200,000 per year in the first year, to O&M, which he considered to include maintenance with a life of one year or less. He then assigned 1% of the

---

[6] PM&E expenses are associated with certain requirements imposed by FERC and which which may accompany relicensing.

value of the facility per year to capital improvements with a life longer than one year—amounting to approximately $1,300,000 in the first year—which he explained was comparable to what similar companies were spending on capital projects. He also included $1,500,000 in expenses associated with the expected costs associated with FERC relicensing in 2018 and amortized the expenses over the life of the forty-year license at $38,000 per year.

¶ 10.   Inherent in Sansoucy's DCF analysis is the facility's remaining value at the end of the term of the DCF, or terminal value. The inclusion of terminal value in Sansoucy's DCF has a significant impact on the present value of the facility and is intended to reflect the reasonable expectation that after twenty years, the length of the DCF term, the facility will continue to operate and produce revenue. Sansoucy estimated that in 2031, the facility will generate a net operating cash flow of $22,725,000. He capitalized the after-tax net operating cash flow at a rate of 9% and concluded that a reasonable estimate of the facility's value in the year 2031 would be about $176,000,000. Discounted back to 2012, the terminal value represented $33,900,000 in 2012 dollars.

¶ 11.   Rather than assigning a percentage of the facility's value to capital improvements over the period of the FERC license, Peaco identified two categories of capital expenses: baseline capital expenditures, which taxpayer would incur yearly, and large capital expenses, which taxpayer would incur on a one-time basis. He arrived at the baseline capital expenses by reference to taxpayer's reported capital expenditures for twelve of its hydroelectric facilities over a period of five years, and the one-time capital expenses by reference to several planned large-scale projects, such as the overhaul of the facility's turbines at an estimated cost of $6,976,000. After allocating a dollar amount per kw of capacity for the baseline capital expenses, Peaco subtracted the cost of the one-time capital expenses to arrive at a cost of $12 per kwh. Unlike Sansoucy, Peaco did not account for the return on the capital expenditures by projecting a corresponding increase in the value of the facility itself.

¶ 12.  Rather than amortize the projected cost of relicensing over the life of the forty-year FERC license, Peaco adjusted his final DCF analysis downwards by the estimated costs associated with obtaining and complying with a FERC license.  These costs included the actual cost of getting the license and the cost of complying with the license, or PM&E costs.  Relying on an estimate from taxpayer, Peaco determined that the actual cost of relicensing would amount to $1,000,000.  To determine the PM&E expenses for the Alternative Licensing Process, Peaco consulted a 2001 FERC study[7], which estimated a cost of $58 per kw for projects ranging in size from 25 mw to 100 mw.  Relying on that study, and assuming a buyer would reduce the value of the facility by $100 per kw, Peaco determined that PM&E expenses would amount to $4,700,000.  He then subtracted this figure from the final appraisal value.

¶ 13.  Also unlike Sansoucy, Peaco did not include a terminal value in his DCF analysis because he argued that it inflated the fair market value of the facility, and that the uncertainty related to potential capital improvement requirements and operating restrictions in the FERC licensing process render a terminal value moot.

¶ 14.  Finally, the experts discounted the projected net income to determine fair market value.  The discount rate depends on two factors representing the cost of borrowing money to pay for the purchase of an asset: the rates of return on debt and equity and the ratio of debt to equity.  A lower projected cost of capital typically results in a higher estimated fair market value.  Relevant to this appeal, the experts relied on different debt rates and debt to equity ratios—a disagreement resulting in $11,000,000 of the difference in their valuations.

¶ 15.  Sansoucy ran his DCF over a period of twenty years, using a debt rate of 6%, an equity rate of 10.5%, and a 50:50 debt-to-equity ratio.  He relied on financial reports from a number of major energy companies and compared their debt payments to their overall debt, as

_____

[7] Hydroelectric Licensing Policies, Procedures, and Regulations: Comprehensive Review and Recommendations, Staff of the Federal Energy Regulatory Commission Report to the United States Congress, May 8, 2001, http://www.ferc.gov/legal/maj-ord-reg/land-docs/ortc_final.pdf [https://perma.cc/TM4J-VE35].

well as the debt to equity split reported by recent purchasers of hydropower facilities. Sansoucy testified that his debt rate was based on the rate at which a potential purchaser could borrow capital, and that his equity rate was based on the returns investors in the market were realizing on similar acquisitions. After investigating the debt-to-equity split reported by recent purchasers of similar facilities, Sansoucy concluded that an even split between debt and equity accurately represented the higher on-peak production over that of a typical hydroelectric facility as well as the strong financial structure necessary for a potential purchaser. From these figures, Sansoucy arrived at a 7% weighted average cost of capital (WACC). Adjusted to account for property taxes, Sansoucy achieved a discount rate of 8.6%. Using these data points, he then utilized eight different financial scenarios to develop a range of DCF values for the facility. These eight scenarios represented the volatility in the energy market and the uncertainty of inflation rates. Each scenario applied an inflation rate of either 2.5% or 3% to an energy escalation rate of 0%, 1%, 1.25%, 1.5%, 2.5%, or 3%. The resulting fair market value ranged from a low of $98,307,900 to a high of $142,287,750. He then averaged the eight values to arrive at an estimate a fair market value of $116,417,250.

¶ 16.    Peaco ran his DCF over thirty-seven years to account for the entire term of the renewed FERC license, using a debt rate of 7.3%, an equity rate of 12%, and a 55:45 debt to equity ratio.[8] He used a WACC developed using the build-up method to calculate a return of approximately 12% on equity. His debt rate was based on the Baa bond rate[9], which was 5% in 2012, which he adjusted upwards to 7.3% because of the project's small size and because he

---

[8]  This table represents the cost of capital and discount rates employed by each expert in their respective DCF analyses:

|  | Debt Rate | Equity Rate | Debt:Equity | WACC |
|---|---|---|---|---|
| Sansoucy | 6% | 10.5% | 50:50 | 7% |
| Peaco | 7.3% | 12% | 55:45 | 7.8% |

[9]  Credit ratings are assigned letters by credit rating agencies. Moody's assigns bond credit ratings of Aaa, Aa, A, Baa, Ba, B, Caa, Ca, and C.

assumed it would be financed using non-recourse debt. He did not attempt to verify his assumptions with financial data of comparable companies or market analysis. His equity rate was based on the risk-free Federal Treasury Bond rate of 3%, which he rounded up to 12% based on his assumption as to what a buyer would require. After researching publicly available information on comparable companies, Peaco arrived at a debt to equity ratio of 55:45. From these figures, Peaco arrived at a WACC of 7.8%. Applied to the net income, Peaco estimated a fair market value of $84,000,000.

### B. Comparable Sales Valuation

¶ 17. A comparable sales analysis, or cost approach, is used to develop an indication of the fair market value of a facility, based on the assumption that a buyer would pay no more for the property than the cost of producing an equally desirable substitute. This approach considers the prices at which comparable properties were sold on the open market, divided by either the rated or nameplate capacity, or by the reported annual generation, which is then adjusted to extrapolate for the subject property, taking into account qualitative and quantitative differences between that property and those selected as comparable. This method estimates price per capacity (price per kilowatt hour per year, or kwh-yr), which can be used to estimate the fair market value based on annual generation.

¶ 18. Sansoucy relied on a comparable sales analysis as an additional metric to help determine the fair market value of the facility. Peaco did not undertake a comparable sales analysis. Sansoucy noted that although energy and capacity prices have declined in recent years, comparable sale prices per kwh-yr do not reflect a corresponding decline. He attributed this price stability to four things: (1) a proportional decrease in interest and equity rates in the generating industry, which have resulted in reduced discount rates used by the industry to value potential hydro facility purchases; (2) the reliability of hydroelectric properties as investments; (3) the recent emphasis on renewable energy sources; and (4) long term energy price forecasts.

9

Sansoucy concluded that economic conditions affecting discount rates have balanced the effect of declining energy and capacity prices and ultimately on the sale price of hydro facilities.

¶ 19. Sansoucy's comparable sales analysis arithmetically averaged twelve sales or verified offers to purchase hydro-electric generating facilities that took place between 2007 and 2011.[10] The twelve sales were chosen for their location, motivation of buyers and sellers, financial conditions surrounding the sale, supply and demand in the region, and the physical and economic characteristics of the assets that comprised the property being sold. Sansoucy largely considered sales in the northeast region of the country, where rainfall and river conditions are most similar to those on which the facility itself is located, although he also considered three sales in Wisconsin. Of the twelve sales, two facilities were located in Vermont, four in New York, one in New Hampshire, two in Maine, and three in Wisconsin. One facility, the Stillwater facility in New York, was listed twice: the first time was a sale announcement at $0.66 per kwh-yr, and the second was an actual sale at $0.67 per kwh-yr. These were the two highest prices per kwh-yr in the analysis. A second facility in the analysis, the Newfound facility in New Hampshire, was listed as an offer and not a sale.

---

[10] This table reproduces the relevant portion of Sansoucy's comparable sales data used to develop his average and median price per kwh-yr.

| State | Sale Date | Sale Price ($) | Net Capacity | Generation (MW/yr) | Sale price/ kwh-yr ($) | Capacity Factor |
|---|---|---|---|---|---|---|
| NY | 8/1/2007 | 27,000,000 | 12 | 66,252 | 0.41 | 63% |
| ME | 11/30/2007 | 1,750,000 | 0.867 | 3,140 | 0.56 | 41% |
| NY* | | 9,300,000 | 3.15 | 14,000 | 0.66 | 51% |
| NY | 9/5/2008 | 9,410,000 | 3.15 | 14,000 | 0.67 | 51% |
| VT | 12/11/2008 | 9,000,000 | 4.85 | 22,311 | 0.40 | 53% |
| WI | 3/23/2009 | 22,000,000 | 9.1 | 51,978 | 0.42 | 65% |
| ME | 11/2/2009 | 95,000,000 | 31.88 | 186,786 | 0.51 | 67% |
| NY | 3/18/2010 | 80,100,000 | 33 | 167,390 | 0.48 | 58% |
| WI | 4/1/2010 | 6,100,000 | 2.7 | 10,428 | 0.58 | 44% |
| WI | 1/5/2010 | 80,000,000 | 33.3 | 140,751 | 0.50 | 48% |
| VT | 9/1/2011 | 28,500,000 | 18.1 | 67,258 | 0.42 | 42% |
| NH** | | 3,000,000 | 1.5 | 5,829 | 0.51 | 44% |

* Sale announcement.
** Verified offer, but no final sale.

¶ 20.    From the twelve sales, Sansoucy derived an average sale price of $0.51 per kwh-year.    He then made three upward adjustments to the average price per kwh-yr based on qualitative and quantitative factors he felt rendered the Bellows Falls facility more desirable than many of the comparable facilities.    These adjustments were made because the facility is among the best hydroelectric facilities in the region as a result of taxpayer's recent upgrades and capital investments, ongoing maintenance, efficiency of operation, automation, and coordinated operation.

¶ 21.    Sansoucy's first adjustment was to raise the price per unit of electricity based on additional revenue he attributed to the facility's ratio of on-peak to off-peak generation, which he assumed was higher than other hydroelectric facilities in New England.    He noted that a typical ratio would be 47% on-peak to 53% off-peak generation, and that the facility generated 51.3% of its energy on-peak and 49.8% off-peak.    He did not consider the ratio of on-peak to off-peak generation among those facilities in the comparable sales analysis, however.    His second adjustment was to raise the price per unit of electricity by half the value of the facility's total ancillary revenue.    He indicated that although most of the individual comparable sales will receive at least some ancillary revenues, he did not believe any would capture as much ancillary revenue as the facility itself.    Again, he did not consider the ancillary revenues of the facilities in the comparable sales analysis.    Sansoucy's third adjustment was to increase the facility's sale price by an additional 5% because he believed the facility was entitled to a premium value compared to the other twelve sales.    He stated that the facility was a "good plant, with a very high capacity factor, good water, lots of it."    Based on an annual generation figure of 258,700,000 kwh-yr, at an average price per kwh-yr of $0.55, Sansoucy thus calculated that, as of April 1, 2012, the facility had a comparable sales-based fair market value of $142,287,750. He then adjusted his DCF-based value of $116,000,000 by reference to his comparable sales-based value to arrive at a fair market value of $130,000,000, of which $108,495,400 was

attributable to the Town. Although this figure is, coincidentally, the mid-point between the DCF value and the comparable sales value, Sansoucy did not average the two to arrive as fair market value. As he explained, "the sales comparison approach was 142 million for [the facility], the median of the income approach was 116 million. . . our middle of the road DCF was 134 million. . . so we reconciled in 2012 Bellows at 130 million."

## II. Trial Court's Findings

¶ 22. The trial court found Peaco's $84,000,000 appraisal to be an "incredibly low value" that was "irreconcilable with the great weight of evidence and testimony." The court felt that "[i]t strains reasonableness to insist that the current value is more than twenty million dollars less than what it was in 2001," and that because Peaco's appraisal was "well below any listed value of [the facility] for more than a decade prior to 2012," it "undermine[d] the defensibility of [taxpayer's] position as well as its expert's credibility." It found Sansoucy's $130,000,000 appraisal, on the other hand, to be "a supported and reliable estimate of the fair market value of [the facility] as of April 1, 2012." Even "[a]ccepting that any fair market value calculation is at best an exercise in informed estimation," the trial court considered "Sansoucy to be, decidedly, the more credible expert witness." Finding that taxpayer "presented no credible alternative to fair market value," the trial court held that $130,000,000 was "a supported and reliable estimate of the fair market value" of the facility.

¶ 23. The trial court stated that Peaco's model was unpersuasive for several reasons, including (1) that it assumed, without evidentiary support, that potential purchasers would insist on a 20% pre-tax (12% after tax) equity return; (2) his financial assumptions were not verified with the financial data of comparable companies or market analysis; (3) there was no explanation for the two-percentage points added to the debt rate; (4) he fully deducted the cost of large capital improvements without recognizing the corresponding increase in value the investment would return; (5) he deducted $4,700,000 for PM&E expenses without support for specific

12

expenditures, which overstated the impact of relicensing on the fair market value; (6) there was no evidentiary support for the assertion that the facility would have no value at the end of its license term; and (7) the DCF analysis valued the facility at less than $0.35 per kwh-yr, which is well below the price of even inferior facilities. Although the trial court acknowledged that Sansoucy's comparable sales analysis was "susceptible to critique," it ultimately found his conclusion that the facility had a fair market value of $130,000,000 to be accurate and credible. This appeal followed.

¶ 24. Taxpayer raises two issues on appeal. First, taxpayer raises a number of challenges to the trial court's acceptance of the Town's comparable sales computation, arguing that it was in error because it: (1) was based on offers rather than completed sales; (2) was without adjustment for time, location, size, or inclusion of above-market power contracts; and (3) relied on three upward adjustments from computed average values without supporting data. Second, taxpayer challenges the trial court's acceptance of Sansoucy's DCF analysis because (1) the discount rate was based on below-market debt rates; (2) the estimates of capital costs were unsupported and inconsistent with actual costs; and (3) the computations failed to account for costs associated with FERC licensing. For its part, the Town contends that the trial court's decision must be affirmed because taxpayer does not contest the trial court's central finding that taxpayer presented no credible alternative fair market value.

¶ 25. The trial court reviews tax appraisal determinations from a board of civil authority de novo. 32 V.S.A. § 4467. The trial court is charged with determining the correct valuation of the property—the fair market value—and equalizing the fair market value to ensure that the property is listed comparably to the value of corresponding properties within the town. Id.; see also Kachadorian v. Town of Woodstock, 144 Vt. 348, 350, 477 A.2d 965, 967 (1984) ("First, the fair market value of the property must be determined. Next, the fair market value must be 'equalized' to ensure that the property is listed comparably to corresponding properties in town.

13

When comparable properties exist, their current market value must be compared with their current listed value to arrive at an equalization rate. This rate must then be applied to the subject property's fair market value to produce the proper listed value."). On appeal to this Court, the trial court's conclusions will be affirmed "where they are reasonably drawn from the evidence presented." Dewey v. Town of Waitsfield, 2008 VT 41, ¶ 3, 184 Vt. 92, 956 A.2d 508. "We defer to the court's determinations with regard to evidentiary credibility, weight, and persuasiveness." Id.

¶ 26. "The burden of persuading the trier of fact that his property is over-assessed . . . remains with the taxpayer throughout the entire proceeding." Kruse v. Town of Westford, 145 Vt. 368, 372, 488 A.2d 770, 773 (1985); see also New England Power Co. v. Town of Barnet, 134 Vt. 498, 508, 367 A.2d 1363, 1369 (1976) ("It is to be emphasized . . . that the burden of persuasion as to the contested issues in a § 4467 hearing remains at all times with the taxpayer."). The taxpayer may burst the bubble and defeat the presumption in favor of the appraisal by presenting "credible evidence fairly and reasonably tending to show that [the] property was appraised at more than its fair market value." Adams v. Town of West Haven, 147 Vt. 618, 619-20, 523 A.2d 1244, 1245 (1987) (quotation omitted); see also Rutland Country Club, Inc. v. City of Rutland, 140 Vt. 142, 145, 436 A.2d 730, 732 (1981) ("[T]he presumption of validity of a city's evaluation is overcome when credible evidence is introduced fairly and reasonably indicating that the property was assessed at more than the fair market value." (quotation omitted)).

¶ 27. On appeal before this Court, the superior court's determination "will be deemed presumptively correct and its findings will be conclusive if they are supported by the evidence." Lake Morey Inn Golf Resort, Ltd. P'ship v. Town of Fairlee, 167 Vt. 245, 248, 704 A.2d 785, 787 (1997). We will not set aside the trial court's findings of fact unless they are clearly erroneous, V.R.C.P. 52(a)(2), and we will affirm its conclusions where they are reasonably

14

drawn from the evidence presented. See, e.g., <u>Harte v. Town of Bennington</u>, 153 Vt. 256, 258, 571 A.2d 53, 54 (1989).

### III(A).  Validity of the DCF Analysis

¶ 28.    Taxpayer's first challenge is to Sansoucy's income valuation.  Taxpayer raises three separate arguments: that (1) Sansoucy's discount rate was based on below-market debt interest rates; (2) his estimates of capital costs were unsupported and ignored future capital costs; and (3) he failed to account for costs associated with FERC relicensing.  The State disagrees, describing the trial court's estimate of fair market value using the DCF analysis as reliable and adequately supported by market data and taxpayer's own records, compared to Peaco's DCF analysis, which relied in some cases on assumptions unsupported by data or market evidence.

¶ 29.    The trial court's determination of fair market value relied on Sansoucy's comparable sales analysis and his DCF analysis.  "We have described income capitalization as probably the most accurate way to establish value of commercial properties at least in theory, but have also cautioned about the pitfalls and difficulties in this approach."  <u>USGen I</u>, 2003 VT 102, ¶ 21 (quotation omitted).  "The key is comparability, and economists and other experts will frequently differ, at times widely, as to what comparable investments will yield, even where there is agreement on what constitutes comparability."  <u>Beach Props. Inc</u>., 161 Vt. at 373, 640 A.2d at 52.  The trial court's ability to hear and consider the competing testimony and give it the weight it feels it deserves is therefore critical.

¶ 30.    It is taxpayer's burden to persuade this Court that the facility is over assessed, and this burden is not met by "simply impugning the [Town's] methods or questioning its understanding of assessment theory or technique."  <u>Sondergeld v. Town of Hubbardton</u>, 150 Vt. 565, 568, 556 A.2d 64, 66 (1998).  To prevail, taxpayer must demonstrate that valuation is arbitrary or unlawful.  <u>Id</u>.  The resolution of conflicting evidence is left to the discretion of the

15

trial court. Rutland Country Club v. City of Rutland, 137 Vt. 590, 591, 409 A.2d 591, 592 (1979).

¶ 31. Here, the experts' DCF analyses resulted in a $32,000,000 difference in valuation.[11] The difference in the experts' equity rates—1.5%—resulted in a substantial portion of that $32,000,000, although taxpayer does not dispute the trial court's rejection of taxpayer's assumption that prospective purchasers would demand a 12% return on investment. While the court acknowledged that a 12% return on equity may be desirable to a potential purchaser, it found Sansoucy's debt and equity rates to be more compelling because he successfully demonstrated how both were supported by a market basis.

¶ 32. Sansoucy's DCF analysis relied on a 6% debt rate. He testified that he calculated the debt rate by analyzing financial reports of a number of major energy companies and comparing their reported debt payments to their overall debt. From this data, he determined that assuming a potential purchaser could borrow capital at a 6% interest rate on April 1, 2012 was a conservative estimate. Taxpayer now argues that this rate is, by Sansoucy's own admissions, a below-market debt rate. Although Sansoucy did testify that his debt rate was below what the Treasury would pay, he explained that it was based on taxpayer's own records of what it was able to borrow as a private company.

¶ 33. While we agree with taxpayer that the "selection of [the] rate is of paramount importance in the capitalization process," because "[r]elatively small variations in the rate will significantly change the fair market value," Beach Props., Inc., 161 Vt. at 373, 640 A.2d at 52 (quotation omitted), we do not find the trial court's acceptance of a 6% debt rate to be invalid. Considering Sansoucy's debt rate, the trial court concluded that it was calculated based on taxpayer's own reported debt payments as well as those made by similar corporations. It concluded that taxpayer's challenge failed to demonstrate that Sansoucy's debt rate was invalid,

---

[11] Sansoucy's DCF analysis resulted in a value of $116,417,250, compared to Peaco's $84,000,000.

16

and that taxpayer failed to produce data to contradict his calculation, going as far as to state that Peaco's discount rate appeared to be "driven less by data with connection to actual market forces, and more by the impact each choice makes on suppressing the overall value." Recognizing that there is "no exact science informing calculations of the sort attempted here," the trial court found that Sansoucy was able to demonstrate a market basis for his debt rate, which it found to represent sound estimates and valid inputs.

¶ 34. Taxpayer also challenges Sansoucy's calculation of capital expenses. It argues that Sansoucy's estimate of capital costs was based on an unsubstantiated assumption that capital expenses would account for 1% of the facility's value annually and ignored future capital costs, resulting in the overstatement of net income. The differences in the parties' estimates resulted in a difference in valuation of about $8,400,000.

¶ 35. At trial, Sansoucy testified that he calculated the capital maintenance and capital expenditures necessary to maintain the facility in the shape or condition it was in on the date of the valuation, April 1, 2012. He assigned 1% of the value of the facility per year to long-term capital improvements because allocating a percentage of the value of the facility to capital expenses allows for spending on maintenance to increase over time relative to the value of the facility.[12] Sansoucy arrived at 1% of the value of the facility after analyzing the confidential documents of a wide variety of hydroelectric facilities and determining that 1% of the value of the facility per year is comparable to what similar companies were spending on capital improvements.

¶ 36. Taxpayer argues that Sansoucy's treatment of capital expenditures fails to account for the costs that will be borne by taxpayer in the upcoming years for necessary and planned capital improvements. These include baseline capital expenditures, or recurrent costs that the facility could expect to incur annually, and one-time capital expenses to be expensed in the year

---

[12] Sansoucy calculated that 1% of the value of the facility, which he assumed to be $130,788,000, was $1,308,000 in the first year of the calculation.

they are planned, including projects to overhaul the facility's turbines and repair portions of the dam. Discussing taxpayer's treatment of expenses, Sansoucy explained that some expenditures increase revenue, decrease operating costs, or increase efficiency, which in turn creates value, and that to the extent such expenditures add value to the facility, they should not be expensed from revenue, as they were in taxpayer's analysis. In Sansoucy's opinion, if capital improvements are written off as expenses without appropriate consideration of their contribution to value or efficiency, the value of the facility as a whole may be understated. He explained that in the appraisal of real estate, "you have to be very cautious with capital investments and capital improvements, to the extent that they add value to the property they should not be expensed from revenue, thereby reducing the property value as a result." Sansoucy thus concluded that taxpayer's failure to consider the contribution of expenditures on value or efficiency resulted in the lower valuation.

¶ 37.    The trial court noted that it was "persuaded by [Sansoucy's] explanation of the appropriate treatment of capital expenses," and found taxpayer's approach to be "flawed on its face." After reciting its understanding of Sansoucy's approach, the court adopted his logic, concluding that "fully deducting the cost of a large capital improvement" without "recognizing the added value" of those improvements would "artificially devalue" the facility. For this reason, the trial court found taxpayer's treatment of capital expenditures to be "flawed on its face." The trial court rejected taxpayer's analysis in favor of Sansoucy's more credible approach.

¶ 38.    Here, the trial court carefully explained its decision making process and how it was influenced by the experts' testimony. "If the trial court considered the various approaches offered, assigned weight to each approach, and provided a thorough explanation for its findings and conclusions we will not overturn the court if its order 'appears to be fair, just and equitable according to the evidence presented.' " USGen II, 2004 VT 90, ¶ 49 (citing Town of Barnet, 134

Vt. at 506, 367 A.2d at 1368); see also <u>Barrett v. Town of Warren</u>, 2005 VT 107, ¶ 5, 179 Vt. 134, 892 A.2d 152 ("We will not disturb a fair market value determination unless an error of law exists."). We conclude that the trial court's reliance on Sansoucy's analysis, including the decision to assign 1% of the value of the facility per year to long-term capital improvements, and its rejection of taxpayer's expert's approach, was within its discretion.

¶ 39. Finally, taxpayer argues that Sansoucy failed to account for costs associated with FERC relicensing. It is clear from the record, however, that Sansoucy included $1,500,000 in expenses associated with the expected costs of relicensing in 2018, and that he amortized the total cost over the forty-year license at $38,000 per year because he considered the license to be similar to "a long-term permit." He did not include a separate estimate of PM&E expenses for three reasons: first, taxpayer informed him that all PM&E costs had been incorporated into operations, maintenance, and capital budgets and were not separately identified; second, the facility had undergone most upgrades required for relicensing following the relicensing in 1979; and third, incidental PM&E expenses would be adequately represented in operations and maintenance. Peaco, on the other hand, relied on a FERC study outlining the PM&E expenses associated with relicensing, estimating that it would incur $100 per kw, or $4,700,000 in PM&E expenses, which it then subtracted from the value of the facility.

¶ 40. The trial court considered both parties' estimates for the cost of relicensing. It found that Peaco offered little support for the $4,700,000 in PM&E expenses, that the onetime reduction in the final value of its DCF overstated the impact of relicensing on the fair market value, and was unpersuaded that the figure was a reasonable estimate of relicensing expenses in light of the FERC report. It also found that in relying on the 2001 FERC study, Peaco failed to differentiate between the costs incurred by a facility undergoing its first relicensing compared to a subsequent relicensing. The trial court found Sansoucy's modest PM&E expenses, amortized over the forty-year life of the license, in conjunction with the sizeable yearly operations and

maintenance allocation, to be a more plausible estimate of the likely costs and risks associated with relicensing. The court again explained its decision making process and how it was influenced by the experts' testimony. For the same reason that we affirm the court's decision to accept the capital expenditures in Sansoucy's analysis, we affirm the treatment of relicensing costs. We conclude that the trial court's reliance on Sansoucy's estimate of the cost of relicensing, and its rejection of taxpayer's expert's approach, was within its discretion.

III(B). Validity of the Comparable Sales Valuation

¶ 41. Taxpayer's second challenge is to Sansoucy's comparable sales valuation. Taxpayer first argues that Sansoucy failed to account for necessary adjustments among purported comparable facilities. Specifically, taxpayer contends that Sansoucy failed to account for the date of sale, location or size of the comparable facilities, or the inclusion of above-market power contracts. The Town disagrees, arguing that Sansoucy did, in fact, account for these factors in his analysis. Upon review of the record, it is clear that Sansoucy did account for the date, location and size of the comparable facilities, and the inclusion of power purchase agreements, in his analysis.[13]

¶ 42. In his appraisal, Sansoucy explained that the data did not indicate a need for an adjustment for the date of the sales, stating that "[i]t is clear from the comparable sales data . . . that during the time period between 2006 and [2012], economic conditions affecting discount rates have a balancing effect on declining energy and capacity prices and ultimately on hydro sale prices." He testified that "by 2012 in a de-escalating market for electricity, natural gas, the sale price for hydroelectric plants were holding up very well at their pre-2010 levels." Considering this explanation, the trial court found that the negligible difference in price per kwh-yr obviated the need for a time adjustment.

---

[13] Sansoucy explained at trial that "in appraising, you adjust the comparable property to be similar to the subject property."

¶ 43.   Sansoucy's appraisal also demonstrates that he not only considered the location and size of the comparable facilities, but that he made corresponding adjustments for those factors.  He adjusted the price per kwh-yr relative to the location of the facilities and prices in those energy markets.  Discussing the sales of facilities in Tennessee, Sansoucy noted their location and adjusted the price per kwhr-yr upward to reflect the higher prices in those energy markets.  He also included facilities both larger and smaller than the Bellows Falls facility, variations that necessarily accounted for price differences resulting from size differences.  The trial court acknowledged these adjustments, stating that Sansoucy "adjusted the price for the [facility] upwards to $0.55 per kwhr-yr based on quantitative and qualitative factors he felt rendered [the facility] a more desirable facility than many of the comparables."

¶ 44.   Furthermore, despite taxpayer's contention, Sansoucy did consider whether to make adjustments to account for the inclusion of facilities that market production through power purchase agreements (PPAs).  He testified that despite the difference between such facilities and the Bellows Falls facility, the Bellows Falls facility remained comparable because it "essentially has a PPA with its affiliate," where power is transferred to TransCanada Power Marketing, repackaged with other power plants, and resold into the marketplace.  Sansoucy testified at length about the selection and evaluation of comparable sales for his analysis, testimony the trial court considered.  Although taxpayer argues that Sansoucy failed to account for certain factors, the record shows otherwise, and we will not disturb the trial court's findings.

¶ 45.   Taxpayer also contends that the Town's comparable sales analysis incorrectly relied on three upward adjustments from computed average values without supporting data, and that these adjustments increased the value of the facility in the comparable sales analysis by $7,760,000.  Specifically, taxpayer argues that Sansoucy's upwards adjustment from $0.50 per kwhr-yr to $0.55 per kwhr-yr was based on the assumptions that none of the comparable facilities generate more than 47% of the time during peak hours, that their sale prices did not

21

reflect the potential to generate as much ancillary revenue as the Bellows Falls facility, and that the Bellows Falls facility would be entitled to an additional premium compared to the other sales.

¶ 46. This Court will uphold an adjustment where the appraiser's conclusion that the value of the subject property should or should not be adjusted was rationally derived from the evidence. See Garilli v. Town of Waitsfield, 2008 VT 91, ¶ 13, 184 Vt. 594, 596, 958 A.2d 1188, 1191 (2008) (mem.). When an expert's findings are supported by the evidence, "we must defer" to their valuation, "even if the record contains contradictory evidence." In re Southview Assocs., 153 Vt. 171, 178, 569 A.2d 501, 504 (1989). "Where the record contains some basis in evidence for [the appraiser's] valuation, the appellant bears the burden of demonstrating that the exercise of discretion was clearly erroneous." State Hous. Auth. v. Town of Northfield, 2007 VT 63, ¶ 5, 182 Vt. 90, 933 A.2d 700 (quotations omitted); see also Vt. Elec. Power Co. v. Town of Vernon, 174 Vt. 471, 472, 807 A.2d 430, 433 (2002) (mem.) ("We will defer to the state appraiser when the determination is rationally derived from his findings, even where contradictory evidence exists."). The central question is whether the decision "reveals to the parties and this Court how the decision was reached." Lake Morey Inn, 167 Vt. at 251, 704 A.2d at 789; see Beach Props., 161 Vt. at 371, 640 A.2d at 51 (noting findings "must state clearly what evidence it credits and why, so that the parties and this Court will know how the decision was reached"). The rationale underlying this requirement is to assure this Court and the parties that the trial court's determination of fair market value was not a guess. See New England Power Co., 134 Vt. at 503, 367 A.2d at 1367 ("Findings . . . indicate how the ultimate conclusion is arrived at, and remove from that ultimate conclusion any suspicion that it is only a guess.").

¶ 47. At trial, Sansoucy testified that his upward adjustments were based on several primary factors, both quantitative and qualitative in nature. As he explained, the quantitative factors accounted for the facility's on-peak and off-peak generation and its ancillary revenue, while the qualitative factors accounted for several of the facility's attributes, including its

22

location on the Connecticut River system, taxpayer's control of the river system, the general quality and condition of the facility, its relatively high head,[14] and the facility's ability to sell into multiple markets.

¶ 48. According to the record, Sansoucy testified that the purpose of the comparable sales analysis is to calculate an average price per kwhr-yr of all of the sales in the analysis and to adjust that figure to represent the facility itself. To accomplish this, he considered the difference between the quantitative and qualitative factors of the facility relative to all twelve market sales and determined whether the facility itself was better than, equal to, or worse than the market; whether the facility would be more desirable, equally as desirable, or less desirable than the market. He then made a judgment as to what the competition and price would bring for the facility if offered, in comparison to what other alternate investments in hydroelectric facilities could buy.

¶ 49. He testified that he made quantitative adjustments for the on-peak to off-peak ratio and ancillary revenue because both factors created a differential from the average sale in the market generally. He declined to make adjustments for other quantitative factors because they did not result in a differential from the average sale. Essentially, he adjusted the price per kwh-yr upwards to reflect the fact that the facility's ratio of on-peak to off-peak generation and ancillary revenue were higher than those of the average facility in the market generally: on-peak being 51.3%, compared to the straight run-of-the-river at 47%. He then monetized the difference between the facility and the straight run of the river, using the price of on-peak dollars per kilowatt as of April 1, 2012 and calculating how much more money the facility would make than the straight run of the river. He went through the same steps for ancillary revenues, which are services received for certain attributes. Sansoucy explained that in his experience, although most individual comparable sales receive at least some ancillary revenues, few, if any receive such

---

[14] A high head provides more energy for the same expenditures on operations and maintenance.

23

revenue at the same level as the Bellows Falls facility. He then calculated the difference between the Bellows Falls facility and those in the comparable sales analysis. Considering these factors, Sansoucy made an upward adjustment on the price per kwh-yr of $0.007 for the facility's superior on-peak generation, and $0.006 for its superior ancillary revenue.

¶ 50. Explaining the qualitative adjustments, Sansoucy testified that as an appraiser, he considered all twelve market sales and made a judgment as to what the competition and price would bring for the facility if offered for sale compared to alternate investments in hydroelectric facilities. He considered several characteristics of the facility, including the amount of water on the river, taxpayer's control over that water, and the ability of the facility to use that water, as well as the river head and the marketplace which taxpayer can sell into. Considering these characteristics, Sansoucy testified that he concluded that the facility was superior to many of the comparable sales. Considering all these factors, Sansoucy made a 5% upward adjustment on the price per kwh-yr.

¶ 51. The trial court acknowledged that as with many appraisals based on comparable sales, certain adjustments based on the appraiser's expert assessment may be critiqued as subjective. Considering Sansoucy's explanation of the factors influencing his adjustments to the average price per kwh-yr, the trial court found merit in his assessment that the facility is generally a more desirable hydroelectric facility than the average facility. We note that Sansoucy's adjustments were relative to the average facility in the market generally, regardless of whether the Bellows Falls facility is more desirable than the average facility in the comparable sales analysis, specifically. Regardless, we agree with the trial court that Sansoucy's assessment is supported by the record. Sansoucy explained the basis for his adjustments, including features of the river and the facility itself that elevated it above the average hydroelectric facility. Given the qualitative and quantitative factors presented at trial and the range in sale price per kwr-yr, which was as low as $0.40 and as high as $0.67, it is reasonable that the trial court found

24

Sansoucy's adjustments to $0.55 to be warranted. Furthermore, the trial court stated that it was not persuaded by taxpayer's argument that adjustments based on Sansoucy's expert assessment must be entirely disregarded as lacking support.

¶ 52. As stated above, we will uphold adjustment where the court's conclusion that the value of the subject property should or should not be adjusted was rationally derived from the evidence. See Garilli, 2008 VT 91, ¶ 13. Sansoucy's findings were supported by the record, despite taxpayer's arguments to the contrary, and "we must defer to the [court] when its findings are supported." In re Southview Assocs., 153 Vt. at 178, 569 A.2d at 504. It is clear how the trial court's decision was reached, and that its conclusions were rationally derived from its findings and based on a correct interpretation of the law. We will not reverse the trial court merely because it relied on Sansoucy's assessment rather than Peaco's. See Weyerhaeuser Co. v. Town of Hancock, 151 Vt. 279, 286, 559 A.2d 158, 163 (1989) (stating court "not bound to accept evidence of either party"); Kruse, 145 Vt. at 374, 488 A.2d at 774 (noting that trier of fact is under no obligation to accept, interpret, or apply evidence in accordance with views of either party; it is within its discretion to determine weight, credibility and persuasive effect of evidence).

¶ 53. Finally, taxpayer argues that the Town's comparable sales analysis was incorrectly based on sales and offers, rather than entirely on completed sales. The Town disagrees with this argument, suggesting that it is standard in a sales comparison approach to "gather data on sales, listings, contracts, offers, refusals, and options relating to properties considered competitive with, and comparable to, the subject property."

¶ 54. We acknowledge that the type of property involved in this appeal, a hydro-electric generating facility, is difficult to value. See USGen I, 2003 VT 102, ¶ 21 (noting that "utility property tends to be unique, or close to it, and the methods for valuing it are complicated and frequently contested"). Such facilities are not frequently bought or sold in the usual sense, nor

25

are they readily marketable. Regardless, we have held that "[t]he touchstone for property tax valuations is fair market value." Sondergeld, 150 Vt. at 567, 556 A.2d at 66; see also Royal Parke Corp. v. Town of Essex, 145 Vt. 376, 378, 488 A.2d 766, 767–68 (1985) ("[Section 3481] makes fair market value the standard for appraisal."). Fair market value is "the price that the property will bring in the market when offered for sale and purchased by another." 32 V.S.A. § 3481(1)(A). We have recognized that the sales of comparable properties "between a willing buyer and seller at arms-length" are a valid basis for estimating fair market value. Barrett, 2005 VT 107, ¶ 6 (quotation omitted). This approach relies on voluntary sales that generally take place in an open market, with parties acting in their own best interest. Id; see also Black's Law Dictionary 1535 (8th ed. 2004). (defining arm's length transaction as between two unrelated and unaffiliated parties; or "between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises between buyer and seller."). Such sales must be made in good faith, "and not to 'rig' a fair market value." Barrett/Canfield, LLC v. City of Rutland, 171 Vt. 196, 199, 762 A.2d 823, 825 (2000).

¶ 55. Although an actual sale provides "strong, if not conclusive, evidence of fair market value," the statute does not limit a determination of fair market value to actual sales, allowing for consideration of the price the property will bring on the market. Id. (quotation omitted). Certain situations may require courts to "look beyond a sale," such as "where some evidence undermines the bona fide nature of the sale." Id. In Barnett v. Town of Wolcott, we held that listings, or unaccepted offers to sell, are not reliable evidence of fair market value in a comparable sales analysis "because they reflect a mere hope rather than 'the price which the property will bring in the market when offered for sale and purchased by another.' " 2009 VT 32, ¶ 10, 185 Vt. 627, 970 A.2d 1281 (mem.) (citing 32 V.S.A. § 3481(1)). Unlike a listing, an offer, or unaccepted offer to buy, reflects more than the mere hope of a sale; it represents what

26

the property would bring in the market if the sale was completed. It does not, however, rise to the level of reliability we demand to estimate fair market value.

¶ 56. Here, Sansoucy's comparable sales analysis considered ten sales, an offer, and a sale announcement. Recognizing that an appraisal is "far from an exact science," the trial court found Sansoucy's reliance on sales and offers, rather than sales alone, to have "little measurable impact" on the analysis. As the trial court noted, Sansoucy's comparable sales analysis relied on an average price of $0.51 per kwh-yr and median price of $0.50 per kwh-yr. He then adjusted the price of the facility upwards to $0.55 per kwhr-yr based on quantitative and qualitative factors he felt rendered it more desirable than many of the comparables. At an expected annual generation of 258,705,000 kwh-yr, Sansoucy estimated a comparable sales value of $142,287,750. He then selected the midpoint between the comparable sales value and the DCF value of $116,417,250 for a fair market value of $129,352,500, which he adjusted upward to $130,000,000. This value—$129,352,500—represents an average price per kwh-yr of $0.50, $0.01 less than the average price in the comparable sales analysis.

¶ 57. Excluding both the offer to purchase the Newfound facility in New Hampshire and the sale announcement for the Stillwater facility in New York, however, the average price per kwh-yr would be $0.495 per kwh-yr, a difference of $0.015.[15] After adjusting that price per kwh-yr upwards by $0.04, an adjustment we have affirmed above, and considering the same expected annual generation of 258,705,000 kwh-yr, the comparable sales value without the offers is $138,407,175. The midpoint between that value and the DCF value of $116,417,250 is $127,412,212—$1,940,288 less than Sansoucy's valuation.[16] This lower figure represents an

---

[15] Sansoucy's analysis relied on twelve sales, at $0.41, $0.56, $0.66, $0.40, $0.42, $0.51, $0.48, $0.58, $0.50, $0.42, and $0.51 (all in kwh/yr). Excluding the sale announcement ($0.66) and the offer to purchase ($0.51), the average of $0.41, $0.56, $0.40, $0.42, $0.51, $0.48, $0.58, $0.50, and $0.42 is $0.495 kwh-yr (4.95/10 = $0.495).

[16] As noted supra, ¶ 21, Sansoucy testified that he did not average the DCF and comparable sales values to arrive as fair market value; rather, as he explained, he "reconciled"

average price per kwh-yr of $0.49, or $0.02 less than the average price in Sansoucy's comparable sales analysis.

¶ 58. We will not set aside the trial court's findings of fact unless they are clearly erroneous, V.R.C.P. 52(a)(2), and we will affirm its conclusions where they are reasonably drawn from the evidence presented. See, e.g., Harte, 153 Vt. at 258, 571 A.2d at 54. Here, the trial court's decision to credit an offer and a sale announcement in the same manner as an actual completed sale resulted in an inflated comparable sales value of nearly four million dollars and an inflated fair market value of nearly two million dollars. This is not an insubstantial figure. We therefore conclude that the fair market value of the Bellows Falls facility should be reduced by the amount attributable to the inclusion of the offer and sale announcement in the comparable sales analysis relied upon by the trial court. Because "the record affords the means of correcting [the trial court's] error," the case will not be remanded, and we will enter judgment here. Brooks v. Brooks, 131 Vt. 86, 94, 300 A.2d 531, 536 (1973) (citing Doyle v. Polle, 121 Vt. 335, 339-40, 157 A.2d 226, 230 (1960)). Accordingly, as calculated above, we hold that the facility shall be listed at a fair market value of $127,412,212 for the tax year 2012.

The trial court's valuation is corrected to read $127,412,212, and the remainder of the decision is affirmed.

FOR THE COURT:

_____
Associate Justice

---

the values. Because the $130,000,000 figure is, coincidentally, the average between the comparable sales value and the DCF value, rounded up from $129,352,500, we have likewise reconciled the DCF value and the adjusted comparable sales value by averaging them.