# Bernadette Gionet v. Town of Goshen

[566 A.2d 1349]

No. 87-606

Present: Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.

Opinion Filed September 8, 1989

*Albert J. and Bernadette Gionet,* pro se, Goshen, Plaintiffs-Appellees.

*Neuse & Smith,* Middlebury, for Defendant-Appellant.

**Allen, C.J.** The Town of Goshen appeals from a decision of the State Board of Appraisers (Board) reducing the valuation of taxpayers' property and setting it in the grand list at $61,700. We affirm.

The subject property consists of two houses and a structure serving as a barn or garage on two acres of land. The Listers and the Board of Civil Authority (BCA) both appraised the property at $71,450, consisting of $7,800 for the value of the land and $63,650 for the improvements. Taxpayers questioned only the value of the improvements. The Board decision was confined to correcting an error they found in the Listers' card for the subject property. The card is used to guide the Listers in evaluating the multitude of factors relating to construction and condition of each component part of the property to reach a total appraisal. Referring in its decision to the Listers' cards for the subject and comparable properties, the Board made findings that the Listers had misgraded certain parts of the subject property, yielding an appraised value after all computations of $61,700, rather than the Listers' and BCA's appraisal of $71,450. This appeal followed.

The Town argues that the Board did not make findings as to the values of the comparable properties and therefore failed to follow the mandate of 32 V.S.A. § 4467 that "[t]he findings and determinations of the board shall be made in

writing and shall be available to the appellant." Determinations by the Board on appeal pursuant to § 4467 involve a two-step process. The Board must first determine the fair market value[1] of the property in question and then "equalize" the property to insure that it is listed comparably to corresponding properties in the town. *Kachadorian v. Town of Woodstock*, 144 Vt. 348, 350–51, 477 A.2d 965, 967 (1984). As to determining the fair market value of the property, the Town concedes that "this is covered in considerable detail in Findings of Fact # 13." The Town then goes on to argue that the Board never related its findings to the comparable properties.

In arguing that initial fair market valuation under § 4467 cannot be determined without a direct discussion of comparable properties, the Town construes the Board's discretion far too narrowly. The unswerving goal of the statute is fair market valuation, but there is no single pathway to that goal. In *Sondergeld v. Town of Hubbardton*, 150 Vt. 565, 567–68, 556 A.2d 64, 66 (1988), the taxpayers objected to schedules produced by the State reflecting per-foot frontage values on the lake where their property was located and on two nearby lakes. We held that the State figures had been based on sales and reflected appraised valuation within the meaning of 32 V.S.A. § 3481(1). We stated:

> While the most persuasive method of appraising residential property in Vermont is to establish fair market value through bona fide sale transactions, our statute does not prescribe the method nor limit the manner in which evidence of fair market value may be presented to the Board.

*Id.* at 567, 556 A.2d at 66 (citations omitted).

■ In the present case, the Board also omitted direct comparisons between the subject and comparable properties, but again it met its obligation to consider fair market valuation. It first identified the comparable properties and proceeded to recite in detail the categories in the subject

---

[1] 32 V.S.A. § 3481 defines "appraisal value" as fair market value and "listed value" as equal to 100 percent of the appraisal value. See *Royal Parke Corp. v. Town of Essex*, 145 Vt. 376, 378, 488 A.2d 766, 767–68 (1985).

property it considered misgraded in relation to the same categories in the comparables. As Finding 13 indicated, "The Board regraded the Listers' card using the State manual and *comparing the grading used on all of the comparables cited.*" (Emphasis added.) The Board found that the Listers had misgraded the exterior walls, exterior trim, roof construction, foundation, and interior trim of the subject property, all based on a grading system with numerical "structure units"; that the "cost new" figure of $30,145 declared by the Listers should have been $25,911 as a result of the structure unit changes; and that the total "cost new," after accounting for other items like heat, a second bath, and fireplace, should have been $51,006. The Board then applied the adjustment factor of 1.15 (not in dispute), yielding a total adjusted value of $58,657, reduced by 25 percent, as the house was deemed to be "75% good" on the Listers' card rather than the "85% good," again in relation to the comparables, for a final value of $43,993. The values of the barn-garage and a second, uninhabited dwelling were added to yield a grand total of $61,703, rounded to $61,700.

The Board made a detailed and specific analysis of the subject property. Although Finding 13 does not recite the unit grading for each of the structure criteria (such as exterior walls, trim, floor joists, roof, and foundation) of the comparable properties, the finding taken as a whole does compare subject and comparable properties, criterion by criterion, and does assign numerical values to the former. The appraisal cards of the comparables, each containing its own structure unit grading, were introduced into evidence and were before the Board. While essential findings cannot be left to speculation, see *Roy v. Town of Barnet*, 147 Vt. 551, 551–52, 522 A.2d 225, 226 (1986), here the Board identified the comparables and noted in considerable detail, using specific structural criteria, the differences between subject and comparable properties. It would have been preferable for the Board to note the structure unit grades of the comparables in its findings after electing to compare structural criteria, rather than the broader descriptive characteristics commonly used by the Board in initial valuations under 32 V.S.A. § 4467; however, the

approach it used sufficed to explain what it did and why. See *Chelsea Limited Partnership v. Town of Chelsea*, 142 Vt. 538, 540, 458 A.2d 1096, 1097–98 (1983).

■ ■ The Town also argues that the Board never performed the second step prescribed by § 4467, comparing the subject property to comparable properties for purposes of equalization. The Town has no standing to raise this issue. Equalization is a process designed to promote uniformity of taxation within a town by reducing an initial fair market valuation by the ratio of listed values to fair market values of comparable properties. *Bookstaver v. Town of Westminster*, 131 Vt. 133, 143, 300 A.2d 891, 897 (1973). But in no event may a property be listed at a value higher than fair market value. *Brown v. Town of Windsor*, 139 Vt. 129, 131, 422 A.2d 1268, 1269 (1980). Consequently, any failure of the Board to apply an equalization figure to the subject property was a failure that could only have benefitted the Town. See *Haystack Property Owners Assoc. v. Town of Wilmington*, 151 Vt. 47, 49, 556 A.2d 110, 111 (1989). As taxpayers have not raised the issue, no question of the Board's duty to equalize under § 4467 is before this Court.

■ The Town next argues that the transcript was riddled with errors and omissions and was "confused and incomprehensible." The transcript reflected a hearing that was difficult and complex, involving many computational differences and explanations, as well as discussions and comparisons of the subject and comparable properties. V.R.A.P. 10(e)[2] establishes the procedure for the correction or modification of the record and requires that "[i]f any difference arises as to whether the record truly discloses what occurred [before the board], the difference shall be submitted to and settled by that [board] and the record made to conform to the truth." The record includes no indication that the Town pursued this procedure. The Town is correct that the transcript of the mechanical recording contains numerous omissions and discontinuities, but it falls

---

[2] V.R.A.P. 1(a) states that the Rules of Appellate Procedure govern proceedings to review or enforce administrative board orders.

far short of demonstrating that the total record, which included the Listers' cards and other probative exhibits, was deficient, or how any such deficiency prejudiced the Town. See *In re S.B.L.*, 150 Vt. 294, 297, 553 A.2d 1078, 1081 (1988); cf. *State v. Harvey*, 135 Vt. 549, 550, 382 A.2d 210, 210 (1977) (granting new trial where record below in first degree murder trial was so fraught with error that appellate review was impossible).

■ ■ Finally, the Town argues that taxpayers did not perfect their appeal to the Listers under 32 V.S.A. § 4222 because they failed to submit a written statement of their grievances. The transcript reveals that the Chairman of the Board of Listers "wrote them [grievances] down as notes from him [Mr. Gionet]" on the date of the appeal to the Listers. The notes fully satisfy the requirement of a writing "at or prior to the time fixed for hearing appeals" under § 4222. Although the Town complained to the State Board by letter prior to the hearing that issues concerning the "little house" had not been raised until the tax abatement hearing, the same letter goes on to state that the major issue concerning the house was a zoning, rather than a tax abatement, issue. It appears clear that even if mention of the "little house" was omitted from the notes of the Board of Listers, the omission was insubstantial in light of the lengthy list of complaints actually raised and recorded in the written notes of the Chairman of the Board of Listers and in light of the Town's assertion that in any event the issues concerning the "little house" were not central to the tax appeal but rather were zoning questions.

*Affirmed.*