NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 8

No. 2021-172

| Missisquoi Assoc. Hydro c/o Enel Green Power | Supreme Court |
|---|---|
| | On Appeal from |
| v. | Property Valuation and Review |
| | |
| Town of Sheldon | January Term, 2022 |

Merle Van Gieson, Hearing Officer

Christopher D. Roy of Down Rachlin Martin PLLC, Burlington, and Michael E. Nicholson and Peter J. Crossett of Barclay Damon LLP, Rochester, New York, for Plaintiff-Appellee.

Robert E. Fletcher and Joseph S. McLean of Stitzel, Page & Fletcher, P.C., Burlington, for Defendant-Appellant.

PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Manley, Supr. J. (Ret.), Specially Assigned

¶ 1. **EATON, J.** The Town of Sheldon appeals from the hearing officer's valuation of the subject property—a hydroelectric generating facility—as of April 1, 2019. It challenges the hearing officer's application of the Income Approach to determine the property's fair market value and his rejection of the Town's Direct Sale Comparison approach. The Town essentially argues that the hearing officer's findings are insufficient to support his conclusions. We affirm.

I. Proceedings Below

¶ 2. The record indicates the following. The subject property is owned and operated by Missisquoi Hydro, LLC, (taxpayer), a wholly owned subsidiary of Central Rivers Power, US, LLC.

The property consists of 69.5 acres of land improved with a run-of-the-river hydroelectric generating plant with no storage capacity. The plant has a dam, penstocks, turbines, powerhouses, substations, and related equipment. It has a nameplate capacity of 24,965 kW and an effective nameplate capacity of 21,665 kW because two of six turbines (units four and five) are not operational and unit one is operating at seventy percent of capacity. Unit four and five have been shut down since April 2018 and there are no plans to return these units to operation. A crack in the dam was discovered in late 2019 and an engineering study is underway to determine how best to address this issue.

¶ 3.     The property operates as an Independent System Operator (ISO) under a forty-year license issued by the Federal Energy Regulatory Commission. The property entered into a new twenty-five-year Purchase Power Agreement (PPA) with Green Mountain Power in 2018. It must pay an interconnection tariff to transmit generated power from the point of interconnection to the customer. The annual rate or fee imposed is governed by the ISO-New England tariff and interconnection agreements. The overall cost to the property in 2019 and 2020 ranged from $700,000 to $800,000 per year. The actual expense was $629,244 in 2018 and $724,681 in 2019.

¶ 4.     The Town Board of Listers assessed the property at $44,099,300 for purposes of the 2019 Grand List, a decision that the Board of Civil Authority affirmed. Taxpayer appealed to the Property Valuation Division and Review Board. It argued that the property's fair market value (FMV) was $25,000,000 relying on an assessment prepared by its expert; the Town advocated for a FMV of $44,099,300 relying on its expert's assessment. The experts used various approaches to calculate FMV, including the Income Approach (IA) and Direct Sale Comparison (DSC) methods. Following a de novo proceeding, the hearing officer found that the FMV of the property was $32,303,700 with a listed value of $31,186,000. As discussed in detail below, he concluded that the IA, using reliable evidence and testimony of record in the Direct Capitalization (DC)

methodology, provided the best estimate of the property's FMV on April 1, 2019. He was unpersuaded by the Town's DSC approach.

¶ 5. The hearing officer found that a 2015 appraisal by the Town's expert offered additional support for his FMV determination. In 2015, the Town's expert estimated the property's FMV at $44,100,000. The hearing officer explained that, since 2015, various events occurred that substantially reduced the property's FMV, including: a new PPA that reduced revenue by approximately one-half; the diminished operating capacity of unit one; the 2018 shutdown of units four and five, which reduced the total power generated; and a sharp increase in the interconnection fee (from $138,588 in 2017 to $629,244 in 2018 and $724,681 in 2019). These factors persuaded the hearing officer beyond a reasonable doubt that the FMV of the property on April 1, 2019, was less than its FMV in June 2015. The Town appeals from this decision.

## II.  Standard of Review

¶ 6. Our standard of review is "quite deferential." USGen New England, Inc. v. Town of Rockingham, 2004 VT 90, ¶ 49, 862 A.2d 269, 177 Vt. 193. We presume that the hearing officer's decision is "correct," and we recognize his discretion in determining an appropriate valuation method. Lake Morey Inn Golf Resort, Ltd. P'ship v. Town of Fairlee, 167 Vt. 245, 248-49, 704 A.2d 785, 787 (1997); see also Gionet v. Town of Goshen, 152 Vt. 451, 453, 566 A.2d 1349, 1350 (1989) (recognizing that "[t]he unswerving goal of the statute is fair market valuation, but there is no single pathway to that goal"). "If the [factfinder] considered the various approaches offered, assigned weight to each approach, and provided a thorough explanation for its findings and conclusions we will not overturn [the factfinder's decision] if its order appears to be fair, just and equitable according to the evidence presented." USGen New England, 2004 VT 90, ¶ 49 (quotation omitted). "Where the record contains some basis in evidence for [the factfinder's] valuation, the appellant bears the burden of demonstrating that the exercise of discretion was

clearly erroneous." TransCanada Hydro Ne., Inc. v. Town of Rockingham, 2016 VT 100, ¶ 46, 203 Vt. 289, 154 A.3d 486 (quotation omitted).

¶ 7. As discussed below, we find no error here. While the hearing officer could have made more extensive findings, we can discern from his decision what he decided and why. See id. (recognizing that "central question is whether the decision reveals to the parties and this Court how the decision was reached" (quotation omitted)). He exercised his discretion in deeming the IA more reliable and rejecting the Town's DSC analysis as unpersuasive. His findings are supported by the evidence and the findings support his conclusions and his determination of the property's FMV.

### III. Application of the Income Approach

#### A. Hearing Officer's Decision

¶ 8. We first address the hearing officer's application of the IA. As we have explained, the IA "restates market value by converting the future benefits of property ownership into an expression of present worth." Beach Props., Inc. v. Town of Ferrisburg, 161 Vt. 368, 372, 640 A.2d 50, 52 (1994) (quotation omitted). Underlying this approach is the premise that "a rational investor would pay the fair market value for a piece of property, which is the price (P) that, when multiplied by the rate of return available from alternative investments of comparable risk (the capitalization rate or R), is equal to the property's expected net income (I)." Id. Direct Capitalization (DC) and Discounted Cash Flow (DCF) are two methods used in the IA approach.

¶ 9. The hearing officer found DC a simpler and more direct way of establishing FMV than DCF. In DC, "conversion is accomplished in one step by dividing the net operating income estimate by an appropriate income (Cap Rate) rate." DCF converts future benefits to present value by applying a discount rate to a future value and it requires explicit estimates or forecasts of income and expenditures over a holding period, generally ten or twenty years. See generally TransCanada Hydro, 2016 VT 100, ¶¶ 5-6 (discussing DCF). The hearing officer found a considerable amount

4

of subjectivity and numerous variables involved in the DCF methodology as compared to DC. Given the greater objectivity offered by DC and given that he was asked to decide the property's FMV on one particular day—April 1, 2019—the hearing officer found that DC provided a more reliable estimate of FMV than DCF. In deeming DC appropriate, the hearing officer referenced the minimal amount of variable revenues and expenses for the subject property, the consistent nature of operating expenses, and the guaranteed revenues provided by the PPA with Green Mountain Power.

¶ 10. The Town's expert used DCF but not DC to determine FMV using the IA. Taxpayer's expert used both methods, but the hearing officer rejected taxpayer's DC analysis. He found that taxpayer's expert "turned the simple DC methodology into a complicated, more subjective process by including depreciation & amortization, income taxes, capital expenses, change in working capital, working capital, and intangibles," thereby introducing an "undue amount of subjectivity into the methodology." The hearing officer thus gave little weight to the result achieved from the taxpayer's expert's application of the DC methodology.

¶ 11. As indicated, the DC method converts a single year's net operating income (NOI) to value by dividing the NOI with the capitalization rate (CR). The hearing officer credited taxpayer's expert's evidence of total income from his DC analysis ($4,853,832) over the values offered by the Town because taxpayer's expert used energy revenues based on the contracted rates from the PPA signed in 2018 and not the market projections forecast for electricity. The hearing officer found the total expenses to be the value offered by taxpayer ($1,434,390) plus $263,372, which represented the difference between taxpayer's expert's listed expense for interconnection and station service ($461,309) and the data provided by taxpayer showing that this expense in 2019 was $724,681. This resulted in total expenses of $1,697,762.

¶ 12. The parties also offered different CRs. The Town used a CR of 7.3% while taxpayer used 9.77%. The hearing officer found that a primary difference between these values

5

resulted from the Town's expert using a 60-40% debt-to-equity ratio while taxpayer's expert used a 40-60% ratio. He noted that the Town's expert, in his 2015 appraisal report, had used a debt-to-equity ratio of 50-50% and a CR of 10%. The Town reached its 2019 result based on data from twelve companies chosen from the Value Line Investment Survey, "a professional research company providing data on approximately 1,700 industries, companies, economies, and world markets." The hearing officer observed that the Value Line Investment Survey "obviously provides a very large number of companies to choose from" and he noted that the Town's expert used different companies to determine a debt-to-equity ratio than he did in his DSC valuation.

¶ 13.    Taxpayer's expert reviewed data over a six-year period, 2014-2019, to arrive at his CR, using the same eight companies presented in his DSC. While the hearing officer gave no weight to taxpayer's analysis of these eight companies in its DSC because of the methodology used, he found the debt-to-equity ratio of these companies to be convincing evidence of an appropriate ratio. He found that the Town provided no debt-to-equity ratio for any of the seven companies analyzed in its DSC, even though the debt-to-equity ratio for the company most comparable to the subject property would have provided reliable evidence of an appropriate ratio. The hearing officer concluded by stating, "[c]onsidering all evidence and testimony relative to a debt-to-equity ratio, I find that a 60-40 percent ratio is more creditable than a 40-60 percent."

¶ 14.    Based on his analysis, the hearing officer divided the NOI ($3,156,070) by a CR of 9.77% and estimated the FMV at $32,303,700. He applied an agreed-upon equalization rate of 96.54%, resulting in a listed value of $31,186,000.

B. Town's Challenges

¶ 15.    The Town first asserts that the hearing officer's findings are internally inconsistent because the hearing officer stated that he credited the Town's capital structure (60-40% debt-to-equity ratio) but then applied the CR developed by taxpayer's expert that was premised on a 40-

6

60% debt-to-equity ratio. It thus asserts that the hearing officer committed clear error in applying taxpayer's 9.77% CR. The Town asks the Court to calculate a new value using its CR.

¶ 16. Viewed in context, we find it evident that the hearing officer made a typographical error in stating that he found the Town's 60-40% debt-to-equity ratio more credible than the 40-60% ratio offered by taxpayer. The hearing officer made clear in his discussion that he credited taxpayer's debt-to-equity ratio and explained the basis for that conclusion. See Kachadorian v. Town of Woodstock, 144 Vt. 348, 351, 477 A.2d 965, 967 (1984) (explaining that "[f]indings of fact must state clearly what was decided and how the decision was reached" (quotation omitted)). Consistent with the rationale he set forth, the hearing officer applied taxpayer's ratio in reaching his conclusion. The Town's first claim of error is without merit.

¶ 17. The Town next argues that the hearing officer failed to sufficiently explain why he rejected the Town's proposed capital structure and accepted taxpayer's proposal. The Town questions why the hearing officer found it significant that its expert did not use the same companies in calculating his CR as he did in his DSC and why the hearing officer referenced the source of the Town's data (the Value Line Investment Survey). It asks why, if using the Value Line Investment Survey negatively impacts the probative value of the data, it was acceptable for taxpayer's expert to rely on the S&P Global Market Intelligence. It further contends that the hearing officer needed to explain in greater detail why he was persuaded by taxpayer's expert's approach, including the expert's identification of the eight Guideline Public Companies as risk comparables, his review of data over a six-year period, and his use of the same companies in both determining a CR and in its DSC. It maintains that, as in Vermont Transco, LLC v. Town of Vernon, a mere statement that taxpayer's evidence was more persuasive will not suffice. 2014 VT 93A, ¶¶ 19, 22, 197 Vt. 585, 109 A.3d 423 (per curiam).

¶ 18. As an initial matter, the hearing officer did not make any negative reference to the Town's use of the Value Line Investment Survey in and of itself. He identified the source of the

7

Town's data and recognized that the Value Line Investment Survey "obviously provides a very large number of companies to choose from." The hearing officer took issue with the fact that the Town did not use the same companies in its CR and DSC analyses, noting that one of the properties in the Town's DSC was the most comparable to the subject property and that it would have provided an appropriate ratio. He did not find anything inherently suspect about the Value Line Investment Survey, so the Town's argument about data sourcing rests on a faulty premise.

¶ 19. Turning to the remaining arguments, taxpayer likens this case to Vermont Transco, 2014 VT 93A. That case involved the "valuation of five electrical substations, seven transmission lines, a fiber-optic line, land, and utility easements." Id. ¶ 1. The taxpayer argued on appeal, among other things, that the state appraiser erred by "accept[ing] the Town's valuation without making specific findings concerning the lifespans of the equipment to be used in depreciation or addressing the proper approach for estimating those lifespans." Id. ¶ 18. The parties had advocated two different approaches to this issue below. The state appraiser stated only that he was "persuaded that the town's approach to depreciation is more appropriate than that advanced by [the taxpayer]" and "[t]he evidence supports the belief" that the position advocated by the town "more accurately reflects [the taxpayer's] assets in this appeal." Id. ¶ 19. We found this statement insufficient. We explained that the appraiser was required to make findings regarding the lifespan of the equipment that were "sufficiently detailed for us to determine whether they have support in the record." Id. (citing Vt. Elec. Power Co. v. Town of Vernon, 174 Vt. 471, 474, 807 A.2d 430, 435 (2002) (mem.) ("The state appraiser has a duty to make clear findings and state how his decision was reached. A mere recitation of the contentions of the parties is not sufficient to support the judgment." (citation omitted))). While the appraiser was not required "to calculate the depreciated value of each stick of furniture," he needed to provide a "more compete explanation" as to why he accepted the town's deprecation figures to ensure "a fair process." Id. We therefore remanded for further findings on this question.

8

¶ 20. It is true that the hearing officer's findings in the instant case are somewhat sparse. But the hearing officer here did more than simply state that he was "persuaded" that the taxpayer's approach was "more appropriate" as in Vermont Transco. Id. He provided a rationale for his conclusion.

¶ 21. As indicated above, the hearing officer found it compelling that taxpayer's expert was consistent in identifying relevant companies in his various approaches to valuation; he gave less weight to the Town's approach because the Town did not use the same companies in its valuations and the Town did not include in its CR analysis the most comparable company. The hearing officer noted that the Value Line Investment Survey offered the Town many companies to choose from, and he implicitly questioned why the Town chose the particular companies that it did and why it failed to include the most comparable property in its analysis. While the Town seeks a more thorough explanation, the record here is sufficient to show how the hearing officer reached his decision as to the CR. See TransCanada Hydro, 2016 VT 100, ¶ 25 ("We defer to the [factfinder's] determinations with regard to evidentiary credibility, weight, and persuasiveness.").

¶ 22. The hearing officer did not need to further justify his decision to adopt taxpayer's CR by specifically addressing what it found persuasive about a six-year data review or by justifying the use of a multi-year data review as opposed to the type of review engaged in by the Town. It based its conclusion on the rationale identified above. The hearing officer did not "pick a value out of thin air," as suggested by the Town. As we explained in TransCanada Hydro, the key question on review is "whether the decision reveals to the parties and this Court how the decision was reached." 2016 VT 100, ¶ 46 (quotation omitted.) "The rationale underlying this requirement is to assure this Court and the parties that the [factfinder]'s determination of fair market value was not a guess." Id. That standard is satisfied here.

¶ 23. The Town also argues that the hearing officer failed to adequately explain the use of Guideline Public Companies as risk comparables in the IA. It states that taxpayer's expert chose

his eight Guideline Public Companies because they were in the same industry as Central Rivers Power. It maintains that the risk comparables chosen by taxpayer's expert are vastly different than Missisquoi Hydro and states that it presented evidence to this effect below. It faults the hearing officer for failing to "remark upon these substantive challenges to the risk comparables," and failing to evaluate and resolve this issue. The Town contends that the comparability of these properties was thoroughly contested by the parties.

¶ 24. Again, we conclude that, while a greater explanation might have been beneficial, the hearing officer offered a basis for his decision to credit taxpayer's CR over that offered by the Town, mindful that taxpayer's expert used the eight risk comparables challenged by the Town. The hearing officer implicitly found the particular risk comparables relied upon by taxpayer to be more compelling as compared to the analysis engaged in by the Town, noting that they had been consistently applied. As the Town acknowledges, the hearing officer need not make findings on every issue raised by the party and he was not required to analyze each comparable that made up taxpayer's analysis in reaching his conclusion here. As indicated, there are sufficient findings here to determine what was decided and why with respect to determination of the CR.

¶ 25. Turning to other aspects of the IA, the Town argues that the hearing officer failed to directly reconcile the conflicting evidence presented with respect to the property's interconnection expenses or explain why he credited other components of taxpayer's calculation of total operating expenses. It asserts that the hearing officer failed to explain why, if taxpayer's expert used approximately $457,000 for interconnection expenses in his IA, the 2019 actual transmission expenses were more probative. It also contends that the hearing officer failed to explain why his finding of total expenses ($1,697,762) was appropriate when the two experts' calculations (with an adjustment to the Town's estimate regarding the cost to repair unit one) were within $100,000 of each other. Additionally, the Town questions the hearing officer's decision to

use DC rather than DCF. It cites to testimony from its expert as to why using DCF was more appropriate here.

¶ 26. We find these arguments unpersuasive. It was reasonable to consider the actual interconnection expenses rather than an estimate for these expenses, particularly given the significant differences in these figures. The use of the actual figure did not need to be explained or justified. The hearing officer did not need to explain why he credited each particular expense identified by taxpayer's expert. He explained how he calculated the total expenses and why it differed from the estimates offered by each party. See Weyerhaeuser Co. v. Town of Hancock, 151 Vt. 279, 286, 559 A.2d 158, 163 (1989) (recognizing that factfinder is "not bound to accept the evidence of either party"); Kruse v. Town of Westford, 145 Vt. 368, 374, 488 A.2d 770, 774 (1985) (noting that trier of fact is under no obligation to accept, interpret, or apply evidence in accordance with views of ether party; it is within its discretion to determine weight, credibility, and persuasive effect of evidence). The hearing officer used taxpayer's value with an adjustment for the actual interconnection expense. He offered a reasonable explanation for his decision to use DC rather than DCF and the Town simply wars with the hearing officer's exercise of his discretion on this point. See Vermont Transco, 2014 VT 93A, ¶ 15 ("It is within the discretion of the [factfinder] to determine the most appropriate method for arriving at fair market value." (quotation omitted)). We find no error in the hearing officer's application of the IA to determine the subject property's FMV.

### IV. Rejection of the Town's DSC Approach

¶ 27. Finally, the Town argues that the hearing officer should have credited its DSC approach because this same approach was deemed reliable in TransCanada Hydro, 2016 VT 100. It contends that the hearing officer effectively "dismissed" the Town's evidence simply because it was "not presented in a convenient or familiar format," i.e., a grid format. The Town further argues that the more specific reasons offered by the hearing officer for rejecting its DSC valuation are not

compelling. It asserts that: the $0.51/kWh-year value it proffered is supported by the evidence; the hearing officer did not specify why the $0.04 added to the computed average was contrary to "clear evidence"; and the hearing officer should not have considered two sales to be "outliers" without engaging in a deeper analysis of their relative comparability to the subject property.

¶ 28. The hearing officer made the following findings with respect to the DSC valuation. The Town's expert considered seven hydroelectric sales to determine an estimate of FMV. With one exception (sale four), all were portfolio sales. Sale four was the last U.S. hydroelectric facility owned by Fort Chicago Holdings and was sold as part of Fort Chicago Holdings' strategy to exit the power-generating business. While sale four was of a single facility, the Town presented no analysis of this sale in grid format to indicate an estimate of FMV for the subject property. Because the other six sales were portfolio sales, the hearing officer noted that it was impractical to attempt an analysis of them through DSC in grid format.

¶ 29. The Town's expert used the sale prices of the comparable sales to calculate the price per kWh-year for his report. The price per kWh-year ranged from a low of $0.42 (sale four), to a high of $0.82 (sale seven). The average was $0.51 and the median was $0.44. The expert opined that the subject property was "better than most comparable plants in general" because two of its units (including unit one) were high quality and efficient. For that reason, the expert added $0.04 to the average of $0.51 and used a price per KWh-year of $0.55. This resulted in a FMV estimate of $41,130,000. The Town's expert then deducted $2,000,000 from this estimate to account for the cost to cure the shorted stator coils in unit one, resulting in a $39,130,000 FMV estimate. Taxpayer's general manager testified that the estimated cost to repair unit one was $100,000 and that is what the company budgeted for the repair.

¶ 30. The hearing officer deemed the Town's expert's DSC unreliable. He found the $0.55 price unsupported by the evidence. He explained that in an array of numbers, the median number generally provided the most accurate result as it eliminated any outliers included in the

12

average number. The median value of the seven sales here was $0.44 and the most comparable sale (sale four) was $0.42. Eliminating the two outliers, ($0.66 and $0.72), resulted in a very narrow range for the remaining five sales, the average and median of which were $0.44. The hearing officer found that the evidence indicated that the most reasonable price per kWh-year was the median value, which resulted in a value of $32,903,600 (a value that was very close to that determined by the hearing officer using the IA). Deducting $2,000,000 (which the hearing officer found to be an unsupported amount) lowered the expert's FMV estimate to $30,903,600, which was close to the ultimate result reached by the hearing officer. The Town's expert had added $0.04 to the seven-sales average based on the expert's appraisal and engineering judgment. The hearing officer rejected this as contrary to clear evidence. He added that no adjustments had been made to the comparable sales to account for differences with the subject property in location, size of the hydro plants, or time. He noted that two of the sales occurred in 2013 and were dated sales.

¶ 31. The hearing officer acted within his discretion in rejecting the Town's DSC valuation. See Lake Morey Inn Golf Resort, 167 Vt. at 248-49, 704 A.2d at 787 (explaining that factfinder has discretion to determine appropriate valuation method). The fact that DSC is a recognized valuation method does not mean that the hearing officer was obligated to credit the particular DSC analysis conducted by the Town's expert here.

¶ 32. In TransCanada Hydro, the trial court credited the various adjustments made by the expert to comparables and credited his DSC analysis. 2016 VT 100, ¶¶ 41-44. The expert there "account[ed] for the date, location and size of the comparable facilities . . . in his analysis" and "made corresponding adjustments for those factors." Id. ¶¶ 41, 43. We explained that, on review, the Court would "uphold an adjustment where the appraiser's conclusion that the value of the subject property should or should not be adjusted was rationally derived from the evidence." Id. ¶ 46. In that case, the expert testified to the basis for his various adjustments and the trial court had credited that testimony. We thus upheld its determination.

13

¶ 33. In this case, by contrast, the hearing officer did not credit the Town's expert's testimony. He found the proffered value of $0.55 unsupported by the evidence, clearly meaning that he found the expert's addition of $0.04 to the median value—based on the expert's own judgment—to be unpersuasive. The hearing officer also referenced the Town's failure to make any adjustments to account for differences between the comparable sales and the subject property. While he mentioned the absence of a grid format, formatting was clearly not the driving issue here. Failing to include the outliers was not harmful here as the same median value resulted with or without these comparables (although the average was lower). The hearing officer used the median value.

¶ 34. As noted above, the hearing officer found that adding $0.04 was "contradictory to clear evidence." It is reasonable to conclude that he meant that there was nothing in the evidence offered by the Town to warrant an upward adjustment given the failure to make any adjustments to the comparable sales in its analysis. The hearing officer also found that the most comparable sale (sale four) was $0.42 and that the bulk of the sales (eliminating the outliers) ranged from $0.42 to $0.47, further undermining the argument that a value of $0.55 was appropriate. See Armstrong v. Hanover Ins. Co., 130 Vt. 182, 185, 289 A.2d 669, 671 (1972) (recognizing that Court must construe findings "so as to support the judgment, if possible"). The hearing officer acted within his discretion in rejecting the Town's DSC approach to valuation and instead employing the IA to determine FMV. We find no basis to disturb his decision.

Affirmed.

FOR THE COURT:

_____
Associate Justice

14